Commonwealth *v.* Carr, Appellant.
Commonwealth *v.* Murphy, Appellant.
Commonwealth *v.* McNichol, Appellant.
Commonwealth *v.* Donohue, Appellant.
Commonwealth *v.* Friel, Appellant.

548

Argued September 26, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*William A. Gray,* for appellants.

*Bryan A. Hermes,* with him *Thomas I. Guerin,* Deputy Attorneys General, *Claude T. Reno,* Attorney General, *James N. Lafferty* and *Gilliat G. Schroeder, Jr.,* Assistant Deputy Attorneys General, for appellee.

OPINION BY KELLER, P. J., December 13, 1939:

These appellants, Eddie Carr, John Murphy, Bernard McNichol, Herbert J. Donohue and James John Friel, were jointly tried together with Willis Irwine and Thomas Maguire, on certain indictments charging them

with what may be described in general terms as (1) setting up and establishing a gaming house (Nos. 345-351) ; (2) pool-selling and book-making (Nos. 352-358) ; (3) conspiracy to set up and maintain gambling devices and games of hazard (No. 360) ; and (4) conspiracy to engage in pool-selling and book-making (No. 359).

At the same time, William McQuilken and Elmer Thornton, who had been indicted on September 8, 1938, by the August 1938 grand jury, for the identical offenses, were tried with the beforenamed defendants. The defendants offered no testimony.

The jury acquitted Irwine and Maguire on all charges. Verdicts of guilty were rendered on all indictments against their co-defendants, these appellants. Thornton was found guilty on all indictments against him, and McQuilken was acquitted as to the indictments charging pool-selling and book-making and convicted of those involving setting up and maintaining a gaming establishment.

Judgment was subsequently arrested as to Thornton and McQuilken on the authority of *Com. v. Wilson,* 134 Pa. Superior Ct. 222, 4 A. 2d 324, because the bills were illegally presented to the August grand jury. Identical sentences [1] were imposed on Carr, Murphy, McNichol, Donohue and Friel on four indictments, (one of each class) Nos. 345, 352, 359 and 360, all to run *concurrently*. The defendants severally appealed from each sentence.

Indictment No. 345 contained five counts, charging substantially in the language of the statute violations of sections 55 (as amended by Act of April 7, 1925, P. L. 185), 56 and 57 of the Penal Code of 1860, P. L. 382, relating to gambling. Indictment No. 352 contained nine counts, charging substantially in the langu-

---

[1] Imprisonment for three months in the Philadelphia County Prison and fine of $500.

age of the statute, commission of the various offenses forbidden by the Act of May 22, 1895, P. L. 99, relating to pool-selling, book-making, etc. Indictment No. 359 contained one count and indictment No. 360, two counts. We refer to this because if the law and the evidence support a judgment on any count of an indictment, since the sentence imposed was less than that which might have been lawfully given under any single count, the judgment on the general verdict on that indictment will be affirmed: *Com. v. Blankenstein,* 81 Pa. Superior Ct. 340, 341; *Com. v. Widovich,* 93 Pa. Superior Ct. 323, 327.

The thirty-one assignments of error filed are divided in the statement of questions involved into five heads. They relate (1) to rulings of the court below on questions of evidence; (2) to the refusal of the court to withdraw a juror because of remarks made by the Commonwealth's attorney in the presence and hearing of the jury; and (3) to the insufficiency of the evidence to support the verdicts of guilty. We shall consider the last first.

(1) Counsel for appellants has apparently misunderstood or misapplied our decision in *Com. v. Coyne,* 115 Pa. Superior Ct. 23, 175 A. 291. In that case, three defendants, Dolan, Goslin and Coyne, were jointly indicted for keeping a gambling house and being common gamblers. The indictment was drawn under sections 55, 56 and 57 of the Penal Code and was very similar to that in No. 345 in this case. All three were convicted. Coyne alone appealed. A reference to the testimony in the record shows that a gambling establishment was conducted on the second floor of 3802 Forbes Street, Pittsburgh, known as Monaca Club, the first floor of which was used as a bar. It was not shown that any of the three defendants personally was engaged in the gambling operations. This was done by persons or attendants, "dressed in dinner clothes," who had previously been arrested and convicted or had pleaded

guilty to similar charges. The case against Dolan and Goslin was based on testimony that the entire building had been leased by Dolan under an assumed name; that he and Goslin had made contracts for the furnishings, draperies, rugs, carpets, etc. used in the building and had received and accepted them as satisfactory; that Dolan had paid the employees and contracted for the telephone service; and that he and Goslin were standing around when gambling was going on. No witness saw them gambling. As was pointed out in our opinion there was no evidence in the case connecting Coyne with the leasing or management of the building, the purchase of the furnishings, or the operation of the establishment. Because of that, we reversed the judgment against him. Had he been linked up with Dolan and Goslin in the matters above referred to, it is unlikely that he would have appealed; and if he had, we would have affirmed the judgment. The *proprietor* or *manager* or *backer* of a gambling establishment does not have to take part in its actual operation; he does not have to operate the gambling apparatus or devices himself, or receive or record bets, or do the actual gambling carried on for him by his subordinates. It is probably unusual for him to do so. But he is none the less guilty, if with his knowledge, acquiescence and consent, express or implied, gambling is carried on upon premises in his possession, as owner or lessee, or under his management and control, by his associates or subordinates, who are likewise guilty, if they were present aiding and assisting in carrying on such gambling operations for him: *Com. v. Ciccone*, 85 Pa. Superior Ct. 316, 319. Having cleared up this point we go back to the evidence in these cases.

The evidence conclusively shows that a gambling establishment was being operated in the summer and fall of 1937 at 1507 Moravian Street, Philadelphia. A licensed taproom was conducted on the first floor, but the second floor had a large room used for gambling

and for pool-selling and book-making on horse races. There were two ways of getting to the second floor; one by a staircase leading from the street and the other by a staircase leading from the taproom to a hallway which opened into the gambling room. In this room, along the north wall, there was a gambling device known as a 'Chuck-a-luck' or 'Bird-cage' game, which was played with dice. This was operated by McQuilken. Sometimes 'Black jack' was played on a table nearby instead. McQuilken also conducted this. On the west wall were hung up racing sheets or rundown sheets, for five race tracks, which contained the names of the horses, the jockeys and their weights, their code numbers, betting odds, and other information relative to the races being run at the Aqueduct, Washington Park, Suffolk Downs, Latonia and Agawam Park race tracks. A person, known as a 'board man,' entered the information on these sheets as fast as it was received from a radio broadcasting loud speaker or teleflash, located on the north wall, above the head of the bird cage operator. Changes in the betting odds would be noted on these sheets, and when a race was being run, a description of the race as it progressed and the result would be announced by the teleflash and noted on the rundown sheets. Maguire was generally the board man. A bar or counter in the shape of a horseshoe was placed along the center of the south wall, behind which one, two or, sometimes, three men would be taking or receiving bets on the horses and recording them and receiving the money bet, and paying the winners. The staircase leading to the first floor was along the east side of the room. It was proved that Donohue was the lessee of the entire building for the year December 31, 1936 to December 31, 1937. He signed the lease and paid the rent for the entire building. The contracts for telephone service were made by him with both telephone companies, at least one of which had an installation on the second floor. Contract for electric service covering both floors

was also signed by him. These services were utilized to operate the teleflash or loud speaker device giving details of horse races, which could also be heard on the first floor. Defendant McNichol was the manager of the place. Between the two of them, Donohue and McNichol hired employees, some of whom worked on both floors, and paid them their wages. While Donohue and McNichol were generally moving about on the first floor, and at times assisting the bartender, there was evidence that both of them had been seen on the second floor while gambling and pool-selling and book-making operations were being carried on, although nobody saw them taking bets or operating a gambling game. It was also shown that the racing sheets or rundown sheets which were hung on the west wall containing the names of the entries, jockeys, etc. for the races to be run that day were delivered by mail or express every day to 1507 Moravian Street in packages addressed to Donohue, and that the bills for the same were paid by him to the distributor, Min-Haf Distributing Corporation. There were other details not necessary to be stated. On the whole the evidence connecting Donohue and McNichol with the conduct of the gambling operations was much stronger than that on which Dolan and Goslin were convicted in the Coyne case. If believed, it clearly established their guilt on all indictments.

The evidence, if believed, also clearly linked up Carr, Friel and Thornton with the pool-selling and book-making carried on in connection with this gambling place. There was testimony that all three of them took bets and recorded bets on the races, and received the money bet. It was also shown that on one occasion, about 3:15 o'clock P. M., Friel notified the people in the gaming room to file out, that they were going to close up, and he and Maguire took down the racing sheets from the wall. McQuilken put the bird cage away and Thornton put away his betting sheets, and the people went downstairs. After waiting about fifteen minutes,

the people went upstairs again, the racing sheets were put back on the wall by Friel and Maguire, and McQuilken resumed the bird cage game and Thornton his taking and recording of bets. When Donohue was asked why the second floor was closed up, he said, "I don't know, but I think it is on account of Wilgarde's [the mayor's secretary] blast in the newspapers."

The evidence against Irwine was not so strong and he was acquitted. Maguire was not shown to have taken any bets, or operated any gambling device. He entered on the racing sheets the information received from the teleflash. The jury acquitted him, probably considering him a mere employee, who took no part in the gambling. The jury likewise showed discrimination in acquitting McQuilken of pool-selling and book-making, for there was no evidence of his participation in those activities.

The evidence against Murphy was not as conclusive as that against Carr, Friel and Thornton, but we think it was sufficient to go to the jury. The only witness who testified that Murphy had taken part in receiving bets was a young man named Holmes who said that in August 1937 he went to 1507 Moravian Street—second floor—about eight times; that he bet on the horses, and played the bird cage and black jack games; that a man whom he identified as McQuilken had operated the bird cage game and dealt the black jack; that two other men, whom he identified as Murphy and Thornton had received bets; that he himself had placed three or four bets on the horses with Murphy, who was back of the betting counter. On cross-examination, in answer to the following question, "You are ready to definitely say now, (stand up, Mr. Murphy!), you are ready to definitely say now after a period of 15 months, that you saw this man Murphy there, and you placed bets with him?" he said: "to the best of my knowledge and belief it is so." When asked, if he was sure, he said: "As sure as I can be after a year's time." He reiterated this ex-

pression several times, and said he recognized his (Murphy's) face as well as possible after a year's time. On being further pressed by counsel for Murphy, "Why do you keep talking about as well as possible after a year's time? What do you mean by that? You have doubts in your mind, haven't you?" he replied, "I imagine there might be a slight doubt." The effect of this testimony, taken in connection with his prior testimony, was for the jury, not the court. Assignment of Error No. 29.

In addition, it was shown that a witness named Earley while standing at the bar on the first floor had a check for $35, drawn to his own order, cashed by a man who was present at the bar, and this check when produced showed it was endorsed by Earley and "G. Miller"; that Donohue had cashed a check for $30 drawn by another witness, Bache, to his own order, and this check when produced showed endorsements by Bache, Donohue and "G. Miller"; and it was shown that Murphy had informed the teller of his bank where the checks were deposited to the 'G. Miller' account, that the 'G. Miller' account was his account, and handwriting experts testified that the endorsements 'G. Miller', on these checks were in the same handwriting as Murphy's. By itself, this testimony would not have been sufficient to link up Murphy with the gambling establishment, but in connection with Holmes's testimony, we think it was for the jury. Assignments 12 to 28 inclusive.

We are satisfied that sufficient competent evidence was produced to warrant the conviction of all five appellants.

Furthermore, in view of the fact that the sentences imposed were all concurrent, we do not deem that a reversal and new trial would be required as to Murphy, even if the evidence was insufficient to sustain the verdict against him on indictment No. 345 or 360. A similar question came before us in *Com. v. Yerkes,*

86 Pa. Superior Ct. 5, where the defendant, Yerkes, was convicted on four bills of indictment, two charging him with malfeasance and misdemeanor in office and two with extortion and blackmail. Sentence was imposed on only one bill, one of the two charging malfeasance and misdemeanor in office, because all the charges grew out of the same transaction. By reason of that fact this court held in its majority opinion, that while the evidence was not sufficient to warrant a conviction on the extortion and blackmail bills, "we are of opinion that the submission of them did the defendant no harm and that, therefore, it was not an abuse of discretion to refuse a new trial on that ground." An application for an appeal was made to the Supreme Court, which granted it on *constitutional questions* involved alone, and subsequently affirmed our judgment (285 Pa. 39). We are aware that the refusal by the Supreme Court of an appeal from our judgment is not to be considered an *affirmance* of the judgment; but *where an appeal is allowed, but is limited in its scope to certain questions involved* to the exclusion of others, we think, in such circumstances, the refusal of the Supreme Court to consider the matters excluded from the scope of the appeal is the practical equivalent of an affirmance of the judgment as to those matters, for when an appeal is allowed and an argument is had before the Supreme Court, why limit it to certain questions, unless it was deemed that the matters excluded had been correctly decided? In any event the ruling of this court in *Com. v. Yerkes,* supra, has never been set aside or reversed.

(2) We have carefully considered the assignments of error as to the admission of evidence and the refusal to strike out evidence, and agree with the learned court below that no substantial error was committed in these respects; in fact, in our opinion, the learned trial judge, probably out of over-abundant caution, was somewhat overstrict in passing on the evidence submitted by the

Commonwealth and excluded many items which might properly have been received in evidence. For example, there is no reason whatever why a witness for the Commonwealth, describing what was taking place when he was present on the second floor of 1507 Moravian Street, should not have been allowed to say that (one of the defendants) was taking bets, or receiving bets, or recording bets. There is no better way of describing what the defendant was doing, if done within the sight and hearing of the witness, and this could be elicited on cross-examination. Nor is there any reason why a witness for the Commonwealth should not be permitted to describe the chuck-a-luck game or bird cage game if he was able to do so, and say that McQuilken was operating a chuck-a-luck game or bird cage game, if he was doing that, just as he may say that he was operating a roulette wheel, or a faro game, or wheel of fortune, or any other device or apparatus of hazard or chance. The almost continuous barrage of objections made by defendant's counsel to questions and answers, many of which were entirely proper, but objections to which were nevertheless sustained by the court (probably out of over-abundant caution, as suggested above) interfered greatly with the orderly trial of these cases and justified the Deputy Attorney General's complaint (44a) that these interruptions were destructive of the Commonwealth's case. We refer to one more instance, because there seems to be a misconception prevalent in some Philadelphia courts concerning it. It was referred to on the trial. There is no rule of law in this State which forbids a witness on a criminal trial—who had also testified before the grand jury concerning it—being asked whether he had not testified differently—(stating the substance)—before the grand jury, and if he denies having done so, calling grand jurors or other persons who heard him so testify to contradict him. We expressly so ruled in *Com. v. Fotti*, 93 Pa. Superior Ct. 365, 367-368, where we said: "He [the witness,

Kituski] was then asked whether he had not sworn differently before the grand jury—but on objection by the Commonwealth that he could not be called upon to disclose what was said there, the objection was sustained. The question should have been allowed. 'On no sound principle can it be said that a witness who has testified before a grand jury shall be permitted to claim that his evidence was a privileged communication': *Gordon v. Com.*, 92 Pa. 216, 220. The rule relied upon by the Commonwealth forbids disclosure by the grand jurors of how they or any member of the jury voted, or of the opinion of any of them expressed in relation thereto, or of any act which might invalidate the finding of the jury: *Com. v. Gerstman*, 64 Pa. Superior Ct. 484, 489; *Com. v. Green*, 126 Pa. 531, 536; *Gordon v. Com.*, supra. It does not apply to a witness before them who is being asked concerning his contradictory statements." See also, *Com. v. Mead*, 12 Gray 167 (Mass., BIGELOW, J.); *Com. v. Hill*, 11 Cushing 137 (Mass.). Contradictory statements made by the witness to the Commonwealth's attorney, preparatory to his examination before the grand jury, may also be inquired about and proved, if denied.

We find no reversible error in assignments one to four inclusive and twelve to twenty-nine inclusive, relating to the admission of evidence offered by the Commonwealth and the refusal to strike out evidence so admitted.

The first four relate to the evidence of Julius Lichtenstein, bookkeeper for Min-Haf Distributing Corporation, which supplied the racing sheets used on the west wall of the gambling room on the second floor of 1507 Moravian Street. In view of the testimony already in the case, that these racing sheets came daily from Min-Haf Distributing Corporation to 1507 Moravian Street in packages addressed to Herbert J. Donohue, we think it was permissible to prove by Lichtenstein, who was in charge of the books of the corporation that

the racing forms shipped to 1507 Moravian Street were billed to Herbert J. Donohue at that address, that the bills were paid and that the original checks of Donohue made payable to the Min-Haf Distributing Corporation, photostatic copies of which were shown the witness, had been received by the corporation in payment of said bills. Outside of the testimony of Donohue himself, who could not be called as a witness, we know of no better way of proving these facts, in the light of modern business conditions.

Assignments twelve to twenty-eight inclusive are concerned with the testimony relating to the checks of (1) Bache and (2) Earley, respectively, cashed (1) by Donohue or (2) in his taproom, as beforementioned, which were introduced for the purpose of linking up Murphy with Donohue's establishment. As before stated, the evidence objected to showed the endorsement of the checks by 'G. Miller', their deposit to 'G. Miller's' account in bank; the statement by Murphy to the teller of the bank that the 'G. Miller' account was his account; and testimony that the name 'G. Miller' written on the signature card of the bank and endorsed on the checks was in Murphy's handwriting. Considered in connection with the testimony of Holmes identifying Murphy as one of the persons in the gambling establishment who had taken his bets on the horses, the refusal to strike out which testimony was covered by assignment No. 29, and which we have already ruled was for the jury, we think it was some evidence to be considered by the jury in passing on his relationship to Donohue in the conduct of the gaming house.

(3) The other specific assignments of error—six to eleven inclusive—relate to the refusal of the court to withdraw a juror and continue the case because of remarks made by the Commonwealth's attorney in the presence and hearing of the jury during the course of the trial or in his closing address. We have already briefly adverted to this matter, and are satisfied that

no reversible error was committed by the court in refusing the very many motions for the withdrawal of a juror—including the six specially assigned for error —which were injected into this case; in other words, that the court was not guilty of an abuse of discretion in refusing the motions.

We had occasion to discuss this matter rather fully in *Com. v. Wilcox*, 112 Pa. Superior Ct. 240, 170 A. 455, affirmed 316 Pa. 129, 173 A. 653, and are of opinion that the remarks assigned for error were not—with the single exception which we shall refer to later—of such a character that their effect would be to prejudice the jury against the defendants by forming in their minds a fixed bias and hostility against them, so as to render the jury unable to return a true verdict and require the withdrawal of a juror and the continuance of the case.

There was entirely too much wrangling and interchange of unnecessarily sharp remarks between counsel, but a careful review of the evidence in the record leads us to the opinion that the greater blame for this condition lay at the door of the defendants' counsel than of the Commonwealth's attorney. No defense counsel, any more than a prosecuting attorney, is justified in saying of a witness for the Commonwealth on the stand, in the presence of the jury, " . . . . . . he does not tell the truth" (41a) ; nor to say of a witness called by the Commonwealth as a handwriting expert, at the very outset of his testimony, "He makes a business of examining documents and testifying for money in court" (155a), and, "Yes, he is one of the worst handwriting experts in the country" (156a) ; nor to say, during his cross-examination of a State motor policeman, called as a witness by the Commonwealth—on no ground whatever as disclosed by the record—"I am not treating him as a decent human being because I think he has deliberately tried to frame these defendants" (276a). Had the prosecuting attorney used this lan-

guage, a juror would have been withdrawn and the case continued. Defendants' counsel is not likely to encounter such a motion, for it is generally not to the Commonwealth's interest to continue a case because of defendant's counsel's remarks; but it is just as improper when done by defendant's counsel as by the prosecuting attorney, and it should have drawn a sharp rebuke from the court, when called to its attention by the Commonwealth's attorney, and a severer penalty if persisted in.

Most of the remarks assigned for error were provoked by prior objectionable remarks of defendants' counsel made during the course of the trial, or unnecessarily frequent interruptions of the prosecuting attorney's address to the jury, notwithstanding the fact that under the practice in force in Philadelphia, counsel for the defense had the closing address.

We think the report of Officer Moody—even apart from his *recollection* of the occasion—of his visit to this gambling establishment, which formed the basis of assignment six, (pp. 269a-271a) to wit, that he spoke to Eddie Carr when he entered the room, that he saw him behind the bar taking bets and paying off, and that he placed a bet on Halo in the second race at Suffolk Park, justified his statement that he had placed a bet with Eddie Carr that day; and that there were no contradictory statements to be reconciled; but when counsel kept asking "Does it read 'I placed a bet with Eddie Carr?'" and would not permit the full context to be stated or read by the witness, that the prosecuting attorney's statement, "I object to the misconstruction of the officer's plain report, let the jury read it. Hand it to the jury and let them read it" was not so injurious to the defendant's case as to require the withdrawal of a juror.

None of the defendants took the stand in their own behalf nor did they call any witnesses. Section 10 of

the Act of May 23, 1887, P. L. 158, provides that the neglect or refusal of any defendant actually upon trial in a criminal court, to offer himself as a witness, shall not be treated as creating any presumption against him, nor *"be adversely referred to by court or counsel during the trial."* That provision is strictly enforced in this State (*Com. v. Zukovsky,* 324 Pa. 588, 591-592, 188 A. 349); but it is not to be extended beyond its plain language. Mere statements that the evidence of the Commonwealth is uncontradicted does not violate the defendants' rights: *Com. v. Chickerella,* 251 Pa. 160, 96 A. 129; *Com. v. Oefinger,* 282 Pa. 60, 127 A. 438; *Com. v. Zukovsky,* supra, p. 591; for as pointed out in *Com. v. Saldutte,* 136 Pa. Superior Ct. 52, 57, 7 A. (2d) 121, a defendant may be able to disprove the Commonwealth's case by witnesses other than himself. But when the remark draws attention to the fact that no one can testify on the subject but the defendant and that he failed to do so, it is within the prohibition of the statute; *Com. v. Green,* 233 Pa. 291, 82 A. 250; *Com. v. Zukovsky,* supra, pp. 591, 592. See also *Com. v. Foley,* 24 Pa. Superior Ct. 414. Only one of the remarks assigned for error came within the category prohibited by the statute aforesaid, viz., the tenth, where the Commonwealth's attorney after directing the jury's attention to certain testimony against the defendant, Irwine, alone, said "There's no one else to take the stand and deny it but Irwine. That has not been denied." Had Irwine been convicted, we would have sustained this assignment and granted a new trial *as to him.* But he was acquitted. If the remark did no injury to the single defendant against whom it was directed, it certainly could not hurt the other defendants who were not involved in the remark. Nor do we feel that the remark of the Commonwealth's attorney made during his closing address to the jury, complained of in the ninth assignment, requires a reversal of the judgments and the granting of a new trial.

In saying, in substance, that counsel for defense, who would have the closing address to the jury, had a destructive mind, and would distort and twist the evidence, the prosecuting attorney evidently was referring to his prior contentions that the numerous objections and interruptions of counsel for defendants tended to be destructive of the Commonwealth's case, and that he had misconstrued and placed wrong interpretations on the testimony of the state policemen. In view of the attitude taken by counsel for defendants on the trial and the objectionable remarks directed by him against the Commonwealth's attorney in the course of the verbal sallies above referred to, we do not feel that the remark seriously wounded the sensibilities of counsel, or influenced the jury to the prejudice of the defendants, or that the court abused its discretion in refusing to withdraw a juror and continue the case because of it. Just as pointed out in *Com. v. Wilcox*, 112 Pa. Superior Ct. 240, 258, 170 A. 455; 316 Pa. 129, 146, 173 A. 653, the careful and discriminating verdict of the jury confirms us in the view that their finding was free from passion and prejudice; for they did not find all the defendants on trial guilty on all indictments, but, as before mentioned, they acquitted Irwine and Maguire altogether and McQuilken on those indictments which concerned pool-selling and book-making. Their verdict shows a decision of the case on the evidence, free of passion and prejudice.

The assignments of error are overruled, the judgments are affirmed; and it is ordered that the record be remitted to the court below and that each of the defendants appear in the court below at such time as he may severally be called and that he be by that court committed until he has complied with the sentences or any part of them which had not been performed at the time his appeal was made a supersedeas.