Commonwealth *v.* Pinkenson et al., Appellants.

486

Argued November 22, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Earl Jay Gratz,* for appellants.

*Thomas I. Guerin,* with him *Bryan A. Hermes,* Deputy Attorneys General, and *Claude T. Reno,* Attorney General, for appellee.

OPINION BY CUNNINGHAM, J., January 30, 1940:
These appellants, Jack H. Pinkenson and Harry S. Gilgore, were jointly indicted and tried along with

John Williams, Alexander Commers, William Braverman and Daniel Gilhool at No. 116 August Sessions, 1938, of the court below for having on August 4, 1938, committed various violations of the Act of May 22, 1895, P. L. 99, 18 PS §1461, which may be described in general terms as pool-selling and book-making, occupying part of a building for receiving and paying bets on the results of horse races, setting up and establishing a gaming house and gambling devices, etc. A general verdict of guilty was rendered against all of them except Gilhool who was acquitted. Pinkenson and Gilgore were each sentenced to imprisonment for three months and the payment of a fine of $500 and costs. Pinkenson's appeal to No. 244 October Term, 1939, of this court and Gilgore's to No. 250 are from those sentences.

Appellants were also convicted along with Williams and Braverman at No. 1149 August Sessions, 1938, of having committed similar offenses on July 20, 1937. They were placed on probation for one year under suspended sentences; their respective appeals to above Nos. 246 and 249 of this court are from those convictions. Similar convictions were obtained against appellants and Williams and Braverman, at No. 1150 August Sessions, 1938, for offenses committed on August 30, 1937. Suspended sentences and probation followed upon that indictment. Appellants' appeals to Nos. 245 and 251, respectively, of October Term, 1939, of this court, are from those convictions.

Under another indictment at No. 1151 August Sessions, 1938, tried along with those above mentioned, appellants and their codefendants were acquitted of a charge of conspiracy to commit the offenses specified in the other indictments.

As the only material variation in the indictments relates to the dates upon which the violations are alleged to have been committed, the six appeals were argued together and but one opinion will be filed.

Neither appellant took the stand nor was any evidence offered in his behalf. Through an attentive reading of the three hundred and fifty printed pages of testimony adduced by the Commonwealth at the trial, over which the late Judge MILLAR presided, we find ample, competent and uncontradicted evidence which, if believed by the jury as it evidently was, fully justified the verdicts against appellants. It need not be reviewed in detail. Material facts appearing were that Pinkenson was the lessee and occupant of the second floor of the building at the northeast corner of Chestnut and Fourth Streets in the City of Philadelphia, known as No. 59 Fourth Street, to which entrance was had by a stairway leading from the sidewalk on that street; that the lease was obtained upon the representation by him that he intended to use the space for storing papers and magazines in connection with his newsstand at the corner; that, at his instance, the interior was equipped with receiving and paying booths and all the paraphernalia incident to the receiving, placing and paying of bets on horse races conducted at various tracks, including telephones, Min-Haf run-down sheets, etc.; and that a vestibule had been constructed at the top of the stairway with two doors—the outer one equipped with a buzzer and the inner with a peephole.

The other appellant, Gilgore, was the licensee of a taproom conducted in the ground floor of the building.

The indictments at Nos. 1149 and 1150 charge the commission of offenses on July 20 and August 30, 1937. There was conclusive evidence that in those months both Pinkenson and Gilgore were actively engaged in taking bets from the patrons of the establishment (varying in number from twenty to thirty) upon horse races. Both were inside the booths and Pinkenson paid off the winners. Braverman was "running the board and marking down on the sheets." Williams and Commers were engaged in various activities in connection

with the betting transactions, and Gilhool, acquitted by the jury, was the doorkeeper.

The indictment at No. 116 was based upon the events of August 4, 1938, upon which date the place was raided and the defendants named therein, with the exception of Pinkenson, arrested by state policemen and county detectives. Pinkenson was not in the room at the time of the raid. Officer Moody's testimony with respect to the raid was corroborated by the testimony of his fellow officers, Dando, Roth and Witzel. It was to the effect that they walked up the stairs to the landing at the top and found Gilhool at the peephole in the door. Moody told him he "wanted to play some horses and wanted to see Jack" (Pinkenson). Gilhool told him "Jack" was not there but "Johnny" (Williams) was. Williams came to the door and said he did not know Moody. Thereupon the officers announced who they were and took charge of the situation. About twenty patrons were present and were released after giving their names and addresses. Braverman was working at the "board", Commers and Gilgore were in the booths. Numerous parts of the equipment were seized and marked for identification. In a waste paper basket the lease to Pinkenson for the second floor of the building and a certificate of title to an automobile in his name were found torn in half. Into the same waste basket five intact ten dollar bills had been thrown. Approximately one hundred dollars was found in a metal box kept in the pay-off booth. A gray coat and pair of pants was hanging in a back room connected with one of the booths. In the pockets were several bills, notices, etc., addressed to Pinkenson.

Appellants seek a new trial upon the ground of alleged trial errors. Fifteen assignments of error have been filed in addition to the formal assignments to the judgments, which may for convenience be thus grouped:

(1) Assignments 1, 2, 3 and 4, relate to the admis-

sion, over the objection of counsel for appellants, of certain testimony;

(2) Assignments 5 and 6 to permitting the representative of the Commonwealth to cross-examine his own witnesses;

(3) Assignments 7 to 12, inclusive, to alleged errors in the charge. The remaining assignments are based upon the refusal of appellants' motions for the withdrawal of a juror, the overruling of their demurrers to the evidence, and the denial of a new trial.

The 13th assignment, charging error in denying several motions in behalf of appellants for the withdrawal of a juror, is not covered by the statement of questions involved nor argued in their brief. We have examined the subject matter of the assignment and are convinced the motions were properly denied under the principles fully discussed in *Com. v. Wilcox*, 112 Pa. Superior Ct. 240, 170 A. 455, 316 Pa. 129, 173 A. 653.

Upon turning to a consideration of the assignments relating to the admission of certain testimony, we note that assignments 1 and 2 are based upon the admission of evidence of the conversation, already referred to, between Gilhool and the officers when the latter sought admission on August 4, 1938. Moody at that time did not know the real names of the persons operating the place but from his previous visits knew that one of the persons with whom he had placed bets was called "Jack". When he returned with the other officers he testified he told the doorkeeper, Gilhool, that he had been there before and believed "Jack" would know him. Over the objection of counsel for appellants, Moody was permitted to testify that Gilhool said, "Jack wasn't there" but "Johnny was." "Jack" was subsequently identified by Moody as Pinkenson, and "Johnny" as Williams. If the Commonwealth had relied solely upon this testimony as connecting Pinkenson with the operation of the establishment there would have been some force to the objection. As we said, however, in the recent

similar case of *Com. v. Carr et al.*, 137 Pa. Superior Ct. 546, 10 A. 2d 133: "The *proprietor* or *manager* or *backer* of a gambling establishment does not have to take part in its actual operation; he does not have to operate the gambling apparatus or devices himself, or receive or record bets, or do the actual gambling carried on for him by his subordinates. It is probably unusual for him to do so. But he is none the less guilty, if with his knowledge, acquiescence and consent, express or implied, gambling is carried on upon premises in his possession, as owner or lessee, or under his management and control, by his associates or subordinates, who are likewise guilty, if they were present aiding and assisting in carrying on such gambling operations for him: *Com. v. Ciccone*, 85 Pa. Superior Ct. 316, 319."

Here, there was an abundance of other evidence showing Pinkenson's active participation in the operation of the place upon prior dates and additional testimony showing that he was the lessee of the premises and in control of the activities carried on therein. Under all the circumstances of the case, we are not convinced the trial judge erred in overruling the objection to the admission of this testimony.

After the arrest of Gilhool he made a statement in an office at the headquarters of the investigatory grand jury then sitting; it was taken down stenographically by Eugene J. Maurer, who produced his original notes and a transcript thereof at the trial now under consideration. While the examination of Gilhool was going on, Pinkenson was brought into the room for a short time. The transcript of Gilhool's testimony indicates that after Pinkenson had left the room Gilhool was asked whether "the man who was brought in the office this afternoon while you were being questioned is the man who recently paid your salary as doorkeeper," to which Gilhool replied in the affirmative. When the question was raised as to the admissibility of the ex-

cerpts from Gilhool's statement the trial judge expressly and distinctly ruled: "Of course the testimony can only be used as to Gilhool." Limited as it was to Gilhool, the testimony was properly admitted. It may be noted in passing that the indictment for conspiracy, in which both Gilhool and Pinkenson were named, was also before the jury for its consideration.

The remaining assignment in this group relates to an effort on the part of the Commonwealth to introduce certain testimony to the effect that a number of checks payable to the Min-Haf Distributing Corporation (the distributor of the run-down sheets above referred to) had been drawn by Pinkenson upon his account in the Pennsylvania Company for Insurance on Lives and Granting Annuities. It was proposed at a side bar conference to place in evidence, through the testimony of the head bookkeeper of the bank, photostatic copies of the *faces* of the checks as made by the bank on its recordak machine, but not of the endorsements on their backs; it was not the custom of the bank to make photostats of the reverse sides of the checks. The trial judge, deferring a definite ruling for the moment, indicated to counsel for the Commonwealth that in his opinion the offer did not support its general purpose which was to show that Pinkenson had ordered and paid for the rundown sheets. The head bookkeeper was then permitted to testify to the practice of the bank in handling checks drawn upon it and produced the signature card of Pinkenson, nine ledger sheets of his account, and photostats of the faces of a number of checks drawn by him. When it became apparent that the witness did not know, except through familiarity with the usual course of business in the bank, that the photostats were of checks which had actually been charged to Pinkenson's account, the trial judge sustained the objection to the admission of any of the exhibits produced by the witness. In view of this final ruling, we are not persuaded the court erred in permitting the preliminary examination

of the witness for the purpose of establishing a basis for the disposition of the objection one way or the other. These assignments are overruled.

The 5th assignment alleges error in permitting the Deputy Attorney General trying the case to cross-examine the witness, Gerald T. Bieling, upon a plea of surprise. He was arrested at the time of the raid because he was found inside one of the betting booths. Upon his explanation at the preliminary hearing that he was not an employee, but having lost money as a patron on previous occasions had gone there to try to borrow funds with which to bet, he was discharged. His statement was then taken by the representatives of the Commonwealth. When called as a witness he was evasive with respect to his previous visits to the establishment and claimed he could not remember what he had told the interrogators at the time he made his statement. When it became apparent that the answers of the witness in court were not in accordance with the statement upon which he had secured his discharge, the plea of surprise was proper and the trial judge was fully justified in permitting the cross-examination.

The 6th assignment relates to the granting of a similar permission during the examination by the Commonwealth of its witness, Charles W. Comb, who testified to three or four visits to the establishment but seems to have had a lapse of memory relative to details between the making of a statement shortly after the raid and his appearance in court. The action of the trial judge was well within his discretion. Neither of these assignments can be sustained.

This brings us to assignments 7 to 12, inclusive, challenging various portions of the charge. Some of the excerpts assigned for error when wrested from their context seem to be more open to criticism than they really are. By reason of the method adopted in filing these assignments, we shall be obliged to quote at

greater length from their context than would otherwise have been necessary.

In their consideration it must be constantly borne in mind that the charge consists of two distinct parts: First, a general explanation of the manner in which criminal cases come into court and are there tried; and secondly, the instructions specifically applicable to the case at bar. The jury trying this case was the first one selected from a new panel of jurors then entering upon their term of service. The opening sentence of the charge reads: "Members of the jury, and you members of the jury panel, in view of the fact that this is the first case that has come before this panel of jurors, it may be well to explain to you some of the mechanics of the trial of a criminal case."

After outlining the manner in which indictments are drawn, submitted to a grand jury and acted upon by that body, and after referring to the manner in which trial jurors are selected, the court proceeded: "When twelve jurors who are able to give a full, fair and impartial trial to a defendant or defendants who come before them have been thus called, the Assistant District Attorney makes a speech, the purpose of which is to briefly outline to you the nature of the charges against the defendant or defendants, and to briefly outline the evidence that he hopes to produce in support of the charges. A speech is not testimony. While you are to listen and pay attention to the speeches, you should not consider them when you go to the jury room for the purpose of deliberating on the case, because your verdict, whatever it may be, must be based upon what you believe to be the truth of the testimony as it comes from the witnesses on the witness stand. The aim and object of every trial, whether it is a criminal trial or a civil trial, is to get the truth, the verity of the thing, the verdict, and that is the function of the jury."

Ignoring the fact that the trial judge was here referring to the *opening* address of the representative of

the Commonwealth, this excerpt from the paragraph is assigned for error: "A speech is not testimony. While you are to listen and pay attention to the speeches you should not consider them when you go to the jury room for the purpose of deliberating on the case because your verdict, whatever it may be, must be based upon what you believe to be the truth of the testimony as it comes from the witnesses on the witness stand."

The argument is made that this was, in effect, telling the jury to ignore the arguments of counsel and amounted to a violation of appellants' constitutional right to be heard by their counsel. *Com v. Wood et al.,* 118 Pa. Superior Ct. 269, 179 A. 756, is cited as authority for the proposition that such an instruction constitutes reversible error. If the remarks complained of had been made with direct reference to the *closing* arguments of counsel in the present case, as was the situation in the Wood case, that authority might be applicable. We think it clear, however, from the entire charge that it was not so intended and could not have been so understood by the jury. We find no intimation in this charge comparable with the instruction in the Wood case reading, "You (the jury) are not to be misled or your attention distracted from the evidence by arguments about it." We there held that the jury had been substantially instructed "not to give consideration to the argument of defendants' counsel." That is not the case here and we are satisfied the paragraph, as a whole, did not constitute reversible error. The above is not all the trial judge said with reference to arguments of counsel. In another portion of his general instructions he explained the function of *closing* arguments in this language:

"At the conclusion of the testimony, assuming there is testimony on behalf of the Commonwealth and on the side of the defendant or defendants, the District Attorney then makes another speech, the purpose of which is to persuade you he has established by the testimony

offered, every element of the crime charged against the defendants. He reviews the testimony and then he argues to you and he shows you how one thing fits into another and why this has been done and why that has not been done. The District Attorney is then followed by the attorney for the defendants, who makes a speech intended to persuade you the District Attorney has utterly failed to establish the contention of the Commonwealth, and he argues to convince you that is so. Then the District Attorney may reply to the speech of the defense attorney as to such things as were mentioned in the defendants' counsel's speech that had not already been covered by the District Attorney."

Then, making a specific reference to the case on trial, the judge continued: "You may wonder why that was not done in this case, and you had only one speech by the District Attorney and one by the defense attorney. That is due to the fact that, under our rules of evidence, when the defendant chooses not to offer any testimony in his behalf, the District Attorney is limited to one speech. That gives the defense attorney what we call the right to make the last speech. Some lawyers regard that as a very valuable right because if the defense attorney does not have the last speech, the last thing the jury hears is what the District Attorney says, and some people form their opinion upon what they last hear. That is the explanation of the District Attorney's inability to reply to the defense attorney in this case." When this language relative to closing arguments is taken into consideration we think it clear that the present case is distinguishable from *Com. v. Wood et al.,* supra.

Another excerpt complained of is taken from a paragraph in the general portion of the charge reading: "Now, there are certain fundamentals in every criminal case which must be borne in mind by every jury in every case. I will not repeat this in every case, so you need not be alarmed that you are going to be bored by

a repetition of this every time you get a case; I am doing this because this is your first case, so that you may be familiar with what the defendants are entitled to in the conduct of a trial. One of those fundamentals is that the defendant is presumed to be innocent. I know in some countries the presumption is the opposite, because in France when you are arrested you are presumed to be guilty and it is up to you to work your way out. But we are living in Pennsylvania, and in Pennsylvania the law as I understand it is that a defendant is presumed to be innocent. That is a fancy phrase and does not amount to anything unless the jury gives it life and puts into practise that presumption of innocence, so I say when you begin your deliberations you must begin them with the assumption that these defendants are not guilty, that they are innocent, and at that point you begin to consider the case. That presumption of innocence is with the defendants and continues to be with the defendants until the Commonwealth has met its burden of proof, which is the second essential."

Objection is made to the use of the expression "a fancy phrase" as descriptive of the presumption of innocence. Qualified and explained as it was in the context, we are unable to conclude that by its use the court meant anything more than that the presumption must not be treated as a mere formal expression of a doctrine, but should be given substance and made effective by the jury.

By the 7th assignment it is alleged that the neglect of appellants to offer themselves as witnesses was adversely referred to by the court. That subject was also considered in *Com. v. Carr et al.,* supra, and what was there said need not be repeated. After explaining that upon the conclusion of the Commonwealth's testimony the defendant is "permitted, not required, to take the stand in his own defense and to call witnesses in his behalf, if he chooses," the court continued: "At that point let me say that in this case the defense chose not

to offer any testimony, and it is true that the testimony offered on behalf of the Commonwealth is not denied. It is the defendant's privilege—and when I speak of the defendant in the singular, you must remember I mean it in the plural—to offer a defense or not, as he pleases. This is the Commonwealth's case against the defendant or defendants, and if counsel for the defendants is of the opinion the Commonwealth has not established a case against them and has not furnished testimony in support of every element of the criminal charges against the defendant or defendants, they may not and need not testify in their behalf; and if they choose not to do that, no unfavorable inference can be drawn against their failing to testify, and you must bear that in mind throughout your consideration of the case."

It thus appears that the court told the jury, as it had a right to do, that the testimony offered on behalf of the Commonwealth was not denied, (see cases cited in *Com. v. Carr et al.,* supra,) and specifically instructed them that it was the *privilege* of either or both appellants "to offer a defense or not, as he pleases." The mere suggestion that if appellants' counsel felt the Commonwealth had not proven its case they would naturally and probably choose to refrain from testifying does not seem to us to weaken in any way the positive instruction that "no unfavorable inference can be drawn against their failing to testify." In our opinion, what was here said was not within the prohibition of the statute.

Again, in the 10th assignment a paragraph (and a particular phrase within it) has been separated from its context. "You may from time to time, *although not in this case,* conclude that the interest of a person in the outcome of the case has caused that person to tell you a story that is not true, and if that is your belief, then you should disregard so much of that story as you think is not true." (Italics supplied.)

Immediately preceding this excerpt the trial judge

had said, as a part of his general charge, that it was the exclusive function of the jury to reconcile, if possible, any conflicting statements of witnesses, and added: "Obviously, when two people in the same case tell two different stories, two stories that are diametrically opposed, one is not telling the truth, but it is between the two stories you must determine what is the truth."

As there were no conflicting statements in the testimony in this case it was proper for the court to exclude it from the general instructions intended for the entire panel.

The remaining assignments in this group, requiring consideration, relate to the instructions upon the doctrine of reasonable doubt.

Those instructions were a part of the general charge and followed immediately after the discussion of the presumption of innocence. They read: "The burden of proof in every criminal case in Pennsylvania is upon the Commonwealth. I said a moment ago this case is the Commonwealth's case against these defendants. The burden of proving the Commonwealth's case is upon the Commonwealth, and the third fundamental is that that burden on the Commonwealth is to prove its case beyond a reasonable doubt against these defendants and against every defendant who comes before you while you are on duty here. A reasonable doubt is not a fiction or fancy that you conjure up in your minds for the purpose of relieving you of the performance of an unpleasant duty. Everything that you do while you are here will be unpleasant, except acquitting defendants—I imagine there could be some pleasure in that— but otherwise your duties will be unpleasant. Regardless of the fact that your duties may be unpleasant, they are still the duties you are sworn to do when you take a seat in the jury box. A reasonable doubt must be a real, honest, reasonable doubt, it must be such a doubt as would cause an ordinary person to pause or

hesitate in reaching a conclusion about something in connection with his own affairs, something as to which he would have no cause to pause or hesitate in reaching a conclusion if he did not have that doubt. It is a doubt that must arise from the evidence or the lack of evidence in the case."

During the taking of exceptions to the charge, counsel for appellants complained that the jury had not been affirmatively instructed to acquit the defendants if they had a reasonable doubt of their guilt. "The court: If I did not tell the jury the defendants are entitled to the benefit of a reasonable doubt, I intended to. Members of the jury, if there is a real, reasonable doubt in your mind, give the defendants the benefit of it. It must be a real, honest, reasonable doubt, and they are entitled to the benefit of it."

The argument is advanced in behalf of appellants that the use of the word "real," as descriptive of the kind of a doubt which would work the acquittal of a defendant, was tantamount to saying that it must be a doubt "that an intelligent man or woman can give some reason for entertaining," and *Com. v. Baker*, 93 Pa. Superior Ct. 360, is cited as authority for a reversal.

We do not so read the instruction. We think it clear that the word "real" was used in the sense of being opposed to "fancied"; real or genuine as contrasted with merely ingenious. Read in connection with the preceding statement that "a reasonable doubt is not a fiction or fancy that you conjure up in your minds for the purpose of relieving you of the performance of an unpleasant duty," it seems to us that the instruction was in harmony with the accepted definition in *Com. v. Drum*, 58 Pa. 9, 22, that the doubt must not only be "honest—such a difficulty as fairly strikes a conscientious mind and clouds the judgment—," but it must also "fairly arise out of the evidence and not be merely fancied or conjured up."

A further criticism is directed at the description of

a reasonable doubt as one that "would cause an ordinary person to pause or hesitate in reaching a conclusion about something *in connection with his own affairs* ......" (Italics supplied.)

The following excerpt from the opinion of Mr. Justice STERN in the recent case of *Com. v. Kluska,* 333 Pa. 65, 74, 3 A. 2d 398, is quoted in support of the criticism: "We are of opinion that the jury should be told either that they should not condemn unless so convinced by the evidence that they would venture to act upon that conviction in matters *of the highest importance* to their own interests, or ...... that a reasonable doubt was one that would cause them to hesitate to act in any of the *important* affairs of their own lives. The one form of charge explains the state of mind that must exist in order to warrant a conviction, the other the degree of doubt that should lead to an acquittal."

A sufficient reply to appellants' contention is that these cases were tried on November 21 and 22, 1938, but the opinion in the Kluska case was not filed until January 9, 1939. When the charge was delivered the appellate decisions on the point were, in the language of the Supreme Court, in a state of "vacillation," and the trial judge in this case seems to have adopted a middle ground by using the word "affairs" without any qualifying adjective.

No written points for charge were submitted and therefore, in so far as the case at bar is concerned, it would have been sufficient if the trial judge had merely instructed the jury to give each defendant the benefit of any reasonable doubt to which he might be entitled. See the line of cases from *Com. v. Berney,* 66 Pa. Superior Ct. 434, (affirmed in 262 Pa. 176, 105 A. 54,) to *Com. v. Grill,* 94 Pa. Superior Ct. 330. None of the assignments to the charge can be sustained.

Appellants' demurrers were properly overruled. The evidence upon this record, if believed, is so conclusive as to leave no reasonable doubt of their guilt and they

would be entitled to a reversal only for some clear trial error. Our examination has disclosed none.

The judgments are severally affirmed and it is ordered that the record be remitted to the court below and that each appellant appear in that court at such time as he may be called and that he be by that court committed until he has complied with his sentence, or any part thereof which had not been performed at the time his appeal was made a supersedeas.