Commonwealth *v.* Rosen et al., Appellants, et al.

Argued March 12, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, PARKER, RHODES and HIRT, JJ.

*Lemuel B. Schofield,* for appellants.

*John A. Boyle,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY HIRT, J., July 19, 1940:

Appellants Nussie Rosen and Leon Fitterman and seven others were jointly indicted, charged with conspiracy to set up and maintain a gambling house and to engage in pool selling and book-making. Four of the defendants were fugitives and had not been apprehended. Defendant Meyer Fitterman pleaded guilty; appellants with defendants Larry Katz and Joseph Saracino were jointly tried; all four were convicted. They were acquitted on other charges of substantive offenses committed in pursuance of the conspiracy. The first two assignments of error question the sufficiency of the evidence to sustain the verdict of guilty as indicted.

On the first floor of the premises at 200-C South 13th Street, Philadelphia, there was a "luncheonette" and a soda fountain. Appellants concede that a gambling establishment was operated on the second floor. The only means of access to the second flood was a door leading from the rear of the luncheonette to a stairway. There was a peep hole in the door. A room on the second floor, large enough to accommodate 125 patrons was used for various forms of gambling. There were dice games, such as "Bird Cage" and tables where Black-jack and other card games were played, and complete paraphernalia for book-making and horse race coverage, including racing forms or "rundown sheets" which contained schedules of the day's races, entries, jockeys and their weights, the betting odds and other information. There was also, teleflash equipment for

reporting the progress of the races as they were run and a pay-off booth, where bets were placed and paid.

From the evidence it is clearly established that the gambling establishment was not a one-man concern. There is some evidence that ten or twelve men joined in its operation. The activities on the first and second floors were conducted as a unit. The lease for the whole building was taken in the name of William M. Bergen, which may have been fictitious or an alias used for the purpose by Meyer Fitterman. Electric blower fans delivered to the second floor for use there were paid for with money kept behind the cigar counter on the first floor. Rundown sheets were hung on the wall at the end of the soda fountain and gambling operations were conducted there as well as on the second floor. Katz, a codefendant, obviously ran the luncheonette as a "blind" and served as "look-out." Saracino, another codefendant, who on occasion also took bets, was a "board-man" and marked the "rundown sheets" with information as it was received from the teleflash.

The evidence against Leon Fitterman indicated that he also was a look-out man. Moody, a State police officer testified that he first saw him standing outside and "as you come in he would look you over." On a later occasion when Moody was accompanied by officer Eisenberger, this appellant followed them inside and up to the gambling room where he questioned Moody as to Eisenberger's identity and continued to watch them. Printed forms or rundown sheets used in connection with the gambling on horse races were supplied from time to time by Min-Haf Distributing Company of New York. One of the invoices for this material was paid by the check of Leon Fitterman. All other invoices were paid by Meyer Fitterman. William M. Bergen was the name of the consignee in all of the shipments.

As to appellant Rosen, Moody, the police officer testi-

fied that he visited the gambling establishment on June 22, 1937 and remained about an hour and again on August 31, 1937 when he was there for about two hours, and that during all of the time on each occasion, Rosen was standing behind a counter known as the "pay-off booth" in a corner of the room where bets were being received and paid off by employees in charge. Rosen admitted that he was in the establishment on eight occasions but only for the purpose of placing bets and testified that he went behind the pay-off booth once only and then for the purpose of correcting an error in one of his bets. Going to his credibility, evidence was offered and it is conceded that over a period of about a month he received twelve person to person calls from New York at all hours of the day and night and as early as five o'clock in the morning, and that these calls were charged to the telephone in the luncheonette.

A conspiracy may be inferentially established by showing the relation, conduct, or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed. Where the acts of the parties indicate that they were acting in concert to a common end, the jury properly may be permitted to infer that the concerted action was the result of an unlawful agreement. *Com. v. Bartilson et al.*, 85 Pa. 482; *Ballantine v. Cummings*, 220 Pa. 621, 70 A. 546; *Com. v. McGurk*, 105 Pa. Superior Ct. 383, 161 A. 473; *Com. v. Tilly*, 33 Pa. Superior Ct. 35; *Com. v. Snyder*, 40 Pa. Superior Ct. 485; *Com. v. Fulton*, 56 Pa. Superior Ct. 86; *Com. v. Rothensies*, 64 Pa. Superior Ct. 395; *Com. v. Jermyn et al.*, 101 Pa. Superior Ct. 455. *Com. v. Benz*, 318 Pa. 465, 178 A. 390 need not be regarded as authority to the contrary. Certainly, a foundation must first be laid by proof sufficient to establish the unlawful agreement, before the acts or declarations of one defendant during the existence of

the conspiracy may be received as evidence against all the others. *Com. v. Jermyn,* supra. "The heart of every conspiracy is a common understanding, no matter how it comes into being. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities": *Com. v. Strantz,* 328 Pa. 33, 195 A. 75.

Appellants contend that, since the proof of the conspiracy rests upon overt acts and they were acquitted of the substantive crimes, they cannot be convicted on a charge of conspiracy to commit them. Appellants confuse the question of sufficiency of evidence as a matter of fact and as a matter of law. The jury have found as a fact that there was sufficient evidence to convict appellants of conspiracy. The sufficiency of the evidence as a matter of law to sustain that conviction is in no way affected by the circumstance that the jury acquitted them on the substantive charges. It was within the province of the jury to do so, since as to these charges the doctrine of merger has no application. *Com. v. Corcoran,* 78 Pa. Superior Ct. 430; *Com. v. Falls and Sykes,* 107 Pa. Superior Ct. 129, 162 A. 482; *Com. v. Berman,* 119 Pa. Superior Ct. 315, 181 A. 244; *Com. v. Wm. Strauss,* 89 Pa. Superior Ct. 82.

However, while it is permissible to prove subsequent acts from which the conspiracy itself may be inferred, they must be sufficient to prove the existence of the unlawful combination beyond all reasonable doubt. And insofar as the charge is sought to be sustained by circumstantial evidence the hypothesis of guilt must flow from the facts and circumstances proved and be consistent with them all. The evidence must be such as to exclude to a moral certainty, every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point

to the guilt of the accused, but they must be inconsistent with his innocence. *Com. v. Bone,* 64 Pa. Superior Ct. 44; *Com. v. Byers,* 45 Pa. Superior Ct. 37; *Com. v. Kolsky,* 100 Pa. Superior Ct. 596.

In the light of these principles the only reasonable interpretation of the evidence as to Leon Fitterman is that he was a party to the unlawful confederation. That is a reasonable inference from the testimony that he acted as a "look-out" for the gambling establishment, and that he paid for supplies (though on one occasion only) necessary to the conduct of the unlawful business. *Com. v. Carr,* 137 Pa. Superior Ct. 546, 10 A. 2d 133.

As to the defendant Rosen the testimony is not conclusive. There are circumstances which tend toward his guilt but which fall short of the necessary degree of proof to sustain a conviction. True, it is well known that they, whose business is the violation of the law, have developed a technique which affords much protective coloring. The proprietors keep in the background. In case of a raid, only lesser employees are found to be directly connected with the operation. A part of their obligation to their employer is to assume the risk of arrest.

The business however cannot be run at a profit without supervision and it well may be that Rosen stood behind the counter, where clerks received money as bets were recorded and paid the winners, for the purpose of checking the conduct of the clerks as well as the details of the transactions, the betting risks assumed and the money paid out. The weakness of this evidence however is that, though it points to the guilt of the accused, it is not inconsistent with his innocence. There is no evidence of supervision actively directing the employees in the booth. The booth was separated from the room by a railing but was not enclosed, and a patron, conceivably, may have been permitted to stand

behind the railing and the table to observe what bets were being made. So also, telephone calls from persons whose identity was not established does not stamp Rosen as proprietor rather than a patron. Patrons were allowed to use the telephone in the luncheonette. In *Com. v. Coyne*, 115 Pa. Superior Ct. 23, 175 A. 291, a case involving the similar charge of keeping a gambling house, the acts of the defendant though somewhat stronger evidence against him than in the instant case, were held to be indicative of his close acquaintance with the place and its management but insufficient to establish guilt.

In the third and fourth assignments of error appellants contend that the trial judge failed adequately to define the crime of conspiracy. In this connection, the court charged as follows: "If the district attorney has established to you that these men were also concerned with the operation of that gambling house, you could find them guilty under that conspiracy bill, that is if the men agreed together and understood it was being operated as a gambling place there and they rendered service in concert, knowing it was for that purpose, you could convict them on this conspiracy bill. It does not excuse a man because he is employed as a servant to do something which he knew and did in rendering service in running a gambling house, knowing that was what he was doing; the mere fact he was hired to do it, would not excuse him. If he was helping to operate that place, whether it was for wages or what it was, if he knew he was rendering service in connection with the others who were running that house for the purpose of gambling being conducted there, you could find him guilty." No request was made by appellants for additional instructions. At common law a criminal conspiracy is an agreement between two or more persons with criminal intent to do an unlawful act, or to do a lawful act by unlawful means. The gist of the

offense is the unlawful agreement. *Com. v. Brown,* 58 Superior Ct. 300. While the trial judge failed to give a precise definition of conspiracy as such, he did point out to the jury the elements necessary to constitute the crime, as applied to this particular case, namely, that defendants had to agree together to do an unlawful act, (i. e. to operate a gambling house), with criminal intent ("knowing it was for that purpose"). Furthermore, they had to act "in concert." The facts are unlike those presented in *Com. v. Tracey,* 137 Pa. Superior Ct. 221, 8 A. 2d 622, where defendant was tried on four indictments charging him with serious crimes, yet nowhere in the charge of the court were any of the offenses defined nor instructions given as to the elements essential to them. We held, there, that the court's failure in that regard was fundamental error.

The fifth and sixth assignments of error relate to the instructions on the subject of reasonable doubt. The court first defined a reasonable doubt as follows: "A reasonable doubt is something like the situation in your ordinary affairs of life where you hesitate to decide because you feel you have not enough light on the subject and yet you feel obliged to come to some decision, and when you are in that frame of mind and you cannot come to a decision because of that frame of mind, the law in its mercy says you should say not guilty." Exception to the charge on this point was taken by counsel for the appellants. The prosecuting attorney immediately called the court's attention to the opinion in *Com. v. Kluska,* 333 Pa. 65, 3 A. 2d 398, and the court then charged further on the subject as follows: "Members of the Jury, in charging about reasonable doubt I have said to you that the burden is on the Commonwealth to establish the guilt of the defendants beyond a reasonable doubt. I think I have said to you that when I went to illustrate what a reasonable doubt

was it was like in your ordinary affairs of life when you did not have enough light on the subject, you hesitated to decide, then you have a reasonable doubt. I should have said to you even *in your important affairs* of life if you have to decide, if you thought you did not have enough light on the subject and *could not decide,* you would then have a reasonable doubt. If in this case you have such a doubt, you give the benefit of such doubt to the defendants and acquit them." (The emphasis is ours.)

In the Kluska case, the Supreme Court by Mr. Justice STERN, said: "As a standard and approved form of charge, however, we are of opinion that the jury should be told either, as in the Andrews case, [234 Pa. 597], that they should not condemn unless so convinced by the evidence that they would venture to act upon that conviction in matters of the highest importance to their own interests, or as in the Green [292 Pa. 579] and Jermyn [supra] cases, that a reasonable doubt was one that would cause them to hesitate in any of the important affairs of their own lives. The one form of charge explains the state of mind that must exist in order to warrant a conviction, the other the degree of doubt that should lead to an acquittal."

The question, therefore, is whether the trial judge erred in substituting the following in place of his first statement of the rule: "Even in your important affairs of life if you have to decide, if you thought you did not have enough light on the subject and could not decide you would then have a reasonable doubt."

In *Com. v. Jermyn,* supra, complaint was made of the following statement in the charge of the court on the subject of reasonable doubt: "It must be a substantial doubt, such a doubt as would *prevent* reasonable men from coming to a *conclusion,* that is, to a definite conclusion, on any of the weighty affairs of life." (Italics supplied.) The jury in the instant case

was told, not that a reasonable doubt was one which would cause them to hesitate to act in matters of the highest importance or to hesitate in any of their important affairs, but that it was one which would cause them to be unable *to decide* in their important affairs of life. In this respect the charge was not unlike that in the Jermyn case. Action, in a matter of importance, presupposes a decision. "To decide" in "important affairs of life" is the equivalent of coming to "a definite conclusion on any of the weighty affairs of life." To conclude is "to make a final determination or judgment concerning; to judge; to decide." Webster's New International Dict.

We do not mean to say that the charge in the instant case on the subject of reasonable doubt, is comparable as a whole with that in the Jermyn case, approved in *Com. v. Kluska,* but we are of the opinion that in bare essentials it was not so inadequate as to prejudice the defendants or to constitute fundamental error.

The judgments in Nos. 30 and 32 are affirmed and defendant Leon Fitterman is ordered to appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence imposed or any part of it which has not been performed at the time the appeal in this case was made a supersedeas.

In Nos. 29 and 31, the second assignment of error is sustained as to defendant Nussie Rosen, the judgments are reversed and new trials awarded.