Commonwealth *v.* Neff, Appellant.

Argued September 25, 1961. Before BELL, C. J., MUSMANNO, JONES, COHEN and EAGEN, JJ.

reargument refused April 23, 1962.

4

*John Alan Conte,* with him *Paul E. Courtney,* and *Conte & Courtney,* for appellants.

*Richard P. Steward,* District Attorney, with him *Joseph S. Walko,* First Assistant District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 20, 1962:

Samuel Neff (Neff), James S. Macry (Macry), Robert Yoho (Yoho), and Leon Kaleta (Kaleta), appellants, were indicted by the grand jury of Beaver County on the charges of extortion and conspiracy to extort. The gravamen of these charges was that all four appellants, by reason of their respective official positions, had extorted money from certain contractors who leased equipment to the Pennsylvania Department of Highways (Highway Department) in Beaver County. *All* four appellants were convicted on *both* charges after a trial before Judge MORGAN H. SOHN and a jury in the Court of Quarter Sessions of Beaver County.

After trial, each of the appellants filed motions for an arrest of judgment and a new trial. The court below arrested judgment on the charges of extortion against Neff and Macry, the basis of that ruling being that Neff, chairman of the Democratic party in Beaver County, and Macry, secretary of the same party in that county, were neither public nor quasi-public officers within the meaning and intent of the law relating to the offense of extortion. The validity of that ruling is not before us. The court below did not arrest judgment on the charges of extortion against Yoho and Kaleta, the basis of that ruling being that Yoho, assistant superintendent of the Highway Department, and Kaleta,

a foreman in the Highway Department, were public or quasi-public officers within the meaning and intent of the law relating to the offense of extortion. On the charges against all four appellants of conspiracy to extort, the motions for arrest of judgment and a new trial were dismissed. Appellants were sentenced on the charges whereof they stood convicted. Appeals were taken to the Superior Court which affirmed the judgments of sentence: 195 Pa. Superior Ct. 420, 171 A. 2d 561.[1] We granted allocaturs.

The primary issue presented upon these appeals is whether the evidence is sufficient to support the convictions of all four appellants on the charge of conspiracy to extort and to support the convictions of Yoho and Kaleta on the charge of extortion.

In connection with the charge of extortion it must be noted that The Penal Code (Act of June 24, 1939, P. L. 872, 18 PS §4101 et seq.) does *specifically*[2] designate extortion as an offense: Act of 1939, supra, §318, 18 PS §4318. At common law and by this statute extortion "is the unlawful taking by an officer, by color of his office, of any money or thing of value that is not due him, or more than is due, or before it is due": *Commonwealth v. Saulsbury,* 152 Pa. 554, 559, 25 A. 610; *Commonwealth v. Gettis,* 166 Pa. Superior Ct. 515, 518, 72 A. 2d 619. An "officer", within this common law definition includes a "quasi public officer": *Commonwealth v. Saulsbury,* supra; *Commonwealth v. Gettis,* supra; *Commonwealth v. Lawton,* 170 Pa. Superior Ct. 9; *Commonwealth v. Ruff,* 92 Pa. Superior Ct. 530. In *Commonwealth v. Channing,* 55 Pa. Superior Ct.

---

[1] Judge ERVIN wrote the majority opinion, Judge MONTGOMERY wrote a concurring and dissenting opinion in which Judge FLOOD joined and Judge WATKINS wrote a dissenting opinion in which Judge WOODSIDE joined.

[2] Cf: provisions of The Penal Code as to blackmail (18 PS §4801) and kidnapping (18 PS §4723).

510, 516, President Judge RICE defined "color of office": "Amongst the judicially recognized definitions of color of office, applying to the differing states of facts that may arise, are: a pretense of official right to do an act, made by one who has no such right; the use of official authority as a pretext or cover for the commission of some corrupt or vicious act; an act wrongfully done by an officer under the pretended authority of his office: [citing cases]."

In *Commonwealth v. Horvath*, 187 Pa. Superior Ct. 206, 144 A. 2d 489 (1958), it was stated: "The elements of conspiracy to do an unlawful act are a combination of two or more persons, with criminal intent or corrupt motive, to do a criminal or unlawful act, or an act not in itself unlawful, by criminal or unlawful means: Com. v. Gaines, 167 Pa. Superior Ct. 485, 75 A. 2d 617. The offense of conspiracy is complete the moment the parties agree to do an unlawful thing: Com. v. Ricci, 177 Pa. Superior Ct. 556, 112 A. 2d 656. No explicit, formal agreement need be shown in proving a criminal conspiracy: Com. v. Dunie, 172 Pa. Superior Ct. 444, 94 A. 2d 166. The heart of every conspiracy is a common understanding, no matter how it comes into being. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities: Com. v. Strantz, 328 Pa. 33, 195 A. 75. A conspiracy may be inferentially established by showing the relation, conduct, or circumstances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed: Com. v. Rosen, 141 Pa. Superior Ct. 272, 14 A. 2d 833." "That which gives to the crime of conspiracy its distinctive character is unity of purpose, unity of design, focalization of effort upon a particular project by the

persons named in the indictment. . . . In order that any of the defendants may be convicted of conspiracy, he must be shown to have participated in the alleged general combination or concert with all or some of the other defendants": *Commonwealth v. Zuern,* 16 Pa. Superior Ct. 588, 600.

In proving a conspiracy, direct and positive testimony of the corrupt agreement is not necessary; in fact, " ' the nature of the crime attempted usually makes it susceptible of no other proof than by circumstantial evidence. . . .' " *Commonwealth v. Musser,* 394 Pa. 205, 211, 146 A. 2d 714; *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 202, 154 A. 2d 57. In *Commonwealth v. Hall,* 173 Pa. Superior Ct. 285, 287, 98 A. 2d 386, it was said: "A confederation and agreement to effect an unlawful object seldom can be established by direct testimony as to its precise terms. The agreement nevertheless may be inferred from the acts of the parties, under the circumstances. Commonwealth v. Mittleman et al., 154 Pa. Superior Ct. 572, 580, 36 A. 2d 860. 'It has been consistently and repeatedly held that the acts of the parties may show that there was a concerted action pursuant to a common design to accomplish a common purpose': Commonwealth v. Weiner & Zvon, 148 Pa. Superior Ct. 577, 581, 25 A. 2d 844. 'Where the acts of the parties indicate that they were acting in concert to a common end, the jury properly may be permitted to infer that the concerted action was the result of an unlawful agreement': Commonwealth v. Rosen et al., 141 Pa. Superior Ct. 272, 14 A. 2d 833."

In the instant, as in all, criminal prosecutions, the Commonwealth had the burden of proving appellants' guilt beyond a reasonable doubt, and, to sustain these convictions, the record must contain evidentiary proof of such quality and quantity as meets this burden. In determining whether the Commonwealth has met its

8

burden we must give to the Commonwealth the benefit of all the favorable testimony and all reasonable inferences arising therefrom (*Commonwealth v. Moore*, 398 Pa. 198, 202, 157 A. 2d 65; *Commonwealth v. Wright*, 383 Pa. 532, 536, 119 A. 2d 492).

In the light of these principles we view the instant record. The principal Commonwealth witness was one of the alleged co-conspirators, Edward Nitsche,[3] who admitted that his purpose in testifying was to "get even" with Neff. Nitsche, a construction foreman employed by the Highway Department, testified that in the winter of 1955-1956, at the instance of and accompanied by Yoho, he attended a meeting in Neff's home at which meeting were present Neff, Yoho, Nitsche and Macry. Nitsche testified that the purpose of the meeting was "about raising funds for the campaign". In reply to what plans were discussed at that meeting Nitsche testified: "Q. Mr. Nitsche, you were telling us now about the plans to raise money for the campaign. What plans were discussed there? A. Well, there was plans for a club, and I don't know whether it was supposed—each man that worked for the Highway Department was supposed to give $5 a month dues—each employee. Q. Tell us what you heard said about a club and who said it? A. I think Mr. Macry said about the club, that he was supposed to have tickets printed, but I didn't see the tickets at that time, but I know they was printed afterwards. Q. Was there any discussion there about whether or not the club was a good idea? A. Well, there wasn't much discussion there; but when we went back from Neff's home, I was talking to Mr. Corcoran about it, and he said he didn't agree with anything like that. Q. What else took place at Mr. Neff's home? A. Well, the question come up about contrac-

---

[3] Nitsche entered a plea of guilty and received a suspended sentence.

tors—about rented equipment owners. Q. The question came up about contractors? A. Yes, the rented equipment contractors that rented equipment to the Highway Department. Q. What was said about that? A. Well, I couldn't say who brought it up about they should donate; I know it was—I was appointed to go out and hit the contractors for donation. Q. Who appointed you? A. Well, Mr. Neff. Q. What was said about that? A. Well, I just asked him, 'How much do you think the fellows ought to pay?' and he said, 'At least five per cent.' Q. Was there any other discussion about that plan? A. No, just that I was nominated to do the job, that was all. Q. How is it you got the honor of picking up that money? A. Well, the only way I could state that is when the Democratic Party took over in 1955 and I sold a lot of banquet tickets for that Party, and that is the only way I could see about that. Q. Your job since 1941, you said, had been construction foreman? A. That's right. Q. As construction foreman, where did your duties call for you to work? A. County-wide. Q. County-wide? A. Yes. Q. Did that have anything to do with your collecting from equipment owners? A. Oh, yes. I was told that I know the County better than anyone else—that I should go and contact the contractors. Q. Who told you that? A. Mr. Neff." According to Nitsche, this meeting lasted approximately 45 minutes with Macry "only present maybe 20 minutes to a half hour". In January 1956, Nitsche began collecting money from certain contractors and continued to do so until February or March, 1957 during which time he received contributions from nine or ten contractors. According to Nitsche, the original understanding was that the contributions were to be given to Macry but, after making two such payments, Neff told Nitsche: "Turn the money over to me. I don't trust Macry . . . I am pretty sure Mr. Neff says not to take a check." Asked where Neff made that

statement, Nitsche stated: "Well, he told it to me personally. I just don't know exactly where it was." Nitsche further stated that the money collected by him was given to Neff once a month or once every six weeks, adding "I don't know exactly".

Nitsche related certain incidents: that, in collecting money from a contractor named Rocco from whom he secured $200, Rocco told him: "You know you can be arrested for this" and, when he related this to Neff, Neff told him "Well, don't ask him for anything more"; that he collected from a contractor named Denny in Neff's presence and shoved the money into his [Neff's] pocket, stating to Neff, "This belongs to you"; that a contractor named Beards offered a $1,000 campaign contribution if Nitsche could secure summer work for a grader which Beards owned and, when Nitsche informed Neff of the offer, Neff told him "Well, go ahead and see if you can get an agreement through for him".[4] Nitsche further testified that both Kaleta and Yoho turned over to him "money collected" from certain contractors. Near the end of Nitsche's direct examination the following colloquy took place: "Q. What was the result of anybody who complained about paying? A. Well, the only thing that was said was . . . I asked Mr. Neff what I should do in case somebody doesn't pay and he says, 'Well, don't cancel their agreements,' he says, 'but don't leave them work.' Q. Where was that said? A. Oh, I don't know where it was said. Either—I couldn't remember where that was said."

The Commonwealth also presented the testimony of six contractors[5] who leased equipment to the Highway

---

[4] If believed this would appear to constitute bribery rather than extortion: C.J.S. Bribery, §1, p. 840.

[5] The record reveals that there were 47 contractors who leased equipment to the State during this period. The 6 contractors who testified were Harry Harden, Leland Peters, Clarence Corbin, Grayn Denny, V. Carl Tragesser and Edward Walton.

Department during the period herein involved. Harden testified that he gave one Slade, a construction foreman, a $50 check payable to the Democratic Party and that some time thereafter Yoho and Nitsche "approached [him] about five percent," Nitsche being the one who asked him about it; that he refused to give anything; they then asked him to give back the check he gave Slade and substitute for it a check in the same amount payable to cash and he did as Nitsche requested and gave the check the following day to Nitsche. Harden worked thereafter until the spring of 1957 and he did testify that the $50 contribution was voluntary. Peters testified that he never met either Neff or Macry but that he knew Yoho as a Superintendent of the Highway Department; in March, 1956, Nitsche informed him: "Runt [a nickname], you will have to kick back 5% to Sam Neff or you don't work"; he refused to give any money and continued to work until about July 15, 1956 when his equipment was replaced by the equipment of a Democratic committeeman. Corbin testified he made various payments amounting to approximately 5 percent of the equipment rental fees to Nitsche, Yoho and Kaleta, all of which payments, except one, were made in cash; that Yoho sought a "5 percent for himself" which Corbin refused to pay, settling for "around 2 percent"; that his payments were voluntary and were understood to be campaign contributions; that it is "understood" that "in politics you donate so much or you don't work". However, he testified that Neff informed him that he did not have to pay and no one had threatened him with loss of work.

Denny testified that he made various involuntary payments by check (totalling $500-$600) to both Nitsche and Kaleta; while Nitsche was the first to approach him for payments, Kaleta had previously apprised him of the proposed percentage; on one occasion in Neff's presence, he gave Nitsche a check for $85

whereupon Nitsche told Neff, "I have yours." Denny further said that he worked as a foreman of the Highway Department from May, 1957 to June, 1959 and that during this time, January through April of 1958, he collected four 5% checks from Tragesser (who admitted the payments but testified that they were voluntary campaign contributions) and further that the collections were made after Kaleta informed him, "you know you can be replaced; you collect it or else." In regard to Tragesser's contribution, Denny testified: "I went to tell him about it and we talked about politics and the coming election and about the work, and I told him they was collecting money, and Carl said, 'Yes, I understand the boys are putting in five percent for a campaign fund.' I said that's right—I was supposed to collect his." Walton testified that Nitsche told him he "would have to kick in or else [he] wouldn't work"; that he made the payments unwillingly; that he worked until 1958 and his last payment was made to Kaleta.

Certain other witnesses testified for the Commonwealth. The automotive equipment supervisor for the Highway Department in Beaver County, one Jacobyansky, testified that, for the period of the fiscal year ending June 30, 1956, statewide rentals of highway equipment dropped $1,000,000 whereas rentals in Beaver County were 68 percent higher during that period. On cross-examination, however, Jacobyansky thought that he remembered that in 1956 Beaver County was declared a disaster area and further that at the time of the trial Beaver County district was still the highest in highway equipment rental in the Commonwealth.

· · Bokich, a caretaker of the Highway Department from July, 1955 to May, 1956, testified that in December, 1955 Yoho informed him of the proposed contributions and told him to contact and collect 5 percent from a contractor named Bogovich; that it was decided that he (Bogovich) would give 5 percent of his gross earn-

ings to a fund that was supposedly to be used for campaign purposes; he collected the payments and turned the money over to Yoho and Nitsche was present at times when he gave the money to Yoho.

Mr. Jacobs, Director of Special Audits for the Auditor General, testified that he made an investigation of the Highway Department situation and, in doing so, he interviewed approximately 15 out of 47 contractors renting equipment to the Highway Department. A Mr. Smith, Director of the Bureau of Elections for Beaver County, testified that none of the contractors was listed in the campaign receipts or returns filed in his office for the periods here involved. Mr. Buttermore and Mr. Hasenkopf, both of whom had served as superintendent of highways, testified that they witnessed Nitsche turn over money to Neff.

This is the sum and substance of the Commonwealth's proof in support of its charges.

Neither the opinion of the trial court nor the majority opinion of the Superior Court sets forth or designates the exact *time* of the formation of the alleged corrupt agreement or confederation. In his concurring and dissenting opinion Judge MONTGOMERY declared that the "conspiracy was formed in the winter of 1955-1956, when Neff, Nitsche, Yoho and Macry met at the home of Neff." For this conclusion, i.e., that a conspiracy was *then* formed, we are unable to find factual or legal support.

Granting the Commonwealth the benefit of the most favorable testimony and reasonable inferences arising therefrom, we conclude that there was a meeting at the home of Neff, that this meeting was held in the winter of 1955-56 and that it was attended by Nitsche and all the appellants, except Kaleta. The record indicates that at that meeting a discussion took place of measures to be undertaken to raise funds for political purposes and that one of the suggested measures was that

contractors who leased equipment to the Highway Department "should donate" and that Neff suggested "at least five percent." There is *no proof* that at that meeting an agreement was reached to raise such funds for an unlawful purpose or in an unlawful manner; on the posture of this record it is just as consistent to find that there was an agreement that the contributions were to be made on a voluntary basis as it would be to find that there was an agreement that such contributions were to be demanded by way of threats or to be extracted in an involuntary manner.[6] As the United States Supreme Court said in *U. S. v. Di Re,* 332 U. S. 581, 68 S. Ct. 222, 228: "Presumptions of guilt are not lightly to be indulged from mere meetings."

The closest the Commonwealth came to proof of an unlawful agreement, i.e., that contributions were to be extracted from the contractors by demands, threats or on a "no pay, no work" basis, is the testimony of Nitsche, who stated that, when he inquired of Neff as

---

[6] In this connection an examination of the Act of April 6, 1939, P. L. 16, §1 (25 PS §2374)—presently not in issue—is of interest. That Act, popularly known as the "Anti-Macing Act", provides, inter alia: "It shall be unlawful . . . for any public officer or employe, or any other person whatsoever, directly or indirectly, to *demand* from any . . . subordinate or employe holding any office or position of honor, trust or profit under this Commonwealth, or otherwise engaged or employed in the service of the Commonwealth . . . or any person . . . having a contract with . . . the Commonwealth . . . any assessment or percentage of any money or profit, or their equivalent in any thing of value, with the understanding, express or implied, that the same may be used or shall be used for political purposes: Provided, however, *That nothing in this act contained shall be construed to prohibit voluntary contributions to any political committee or organization for legitimate political and campaign purposes* to the extent such contributions are not prohibited by law." (Emphasis supplied). This Act, distinguishing between lawful and unlawful methods of raising campaign funds, does so on the basis of *demanded* as contrasted with *voluntary* contributions.

to measures to be taken if someone refused to contribute, Neff replied: "Well, don't cancel their agreement but don't leave them work". This conversation took place sometime subsequent to the meeting in Neff's home and neither Yoho, Kaleta nor Macry were present. The cornerstone of the Commonwealth's case was that the appellants had entered into a confederation or agreement that contributions were to be exacted of the contractors by unlawful means. No such agreement took place at Neff's home under the testimony present on this record. If the agreement or conspiracy arises from the Neff-Nitsche conversation the record is silent as to any knowledge of or acquiescence in such an agreement on the part of Kaleta, Macry or Yoho. In short, the Commonwealth has not proven the formation of an agreement—the gist of the crime of conspiracy—between these appellants to accomplish either an unlawful purpose or a lawful purpose by unlawful means.

Proof that contributions were made by the contractors does not per se prove that such contributions were made pursuant to a corrupt or unlawful agreement. In this connection, it must be noted that *not one contractor testified that any one of the appellants in the collection of contributions had threatened them with "no pay, no work".*[7] The collection of the contributions proves, neither directly nor indirectly, the formation of an unlawful agreement and could be just as consistent with a lawful as an unlawful purpose. In *Dahly v. U. S.* (C.C.A. 8), 50 F. 2d 37, 43, it was said: "Even participation in the offense which is the object of the conspiracy does not necessarily prove the participant guilty of conspiracy. The evidence must convince that the defendant did something other than participate in

---

[7] Denny testified that Kaleta, instructing him to collect contributions, said: "You know you can be replaced; you collect it or else."

the offense which is the object of the conspiracy. *There must, in addition thereto, be proof of the unlawful agreement and participation therein, with knowledge of the agreement.*" (Emphasis supplied).

From the evidence upon this record a jury should not have been permitted to find the existence of a corrupt agreement or conspiracy; if there had been such an agreement or conspiracy it could and should have been revealed by Nitsche who, under his own testimony, would have been a party to any such agreement had there been an agreement. In so finding, we do not usurp, the function of the jury; we simply find that the evidence presented on this record fails to satisfy either qualitatively or quantitatively, the standard of proof required to sustain a conviction in a conspiracy case. Stripped of all its gloss, this record at most reveals agreement to secure contributions for political purposes and that such contributions were secured. While there is implication of record that offenses other than charged may have taken place, such fact, if it is a fact, does not aid in proving a charge of conspiracy where there is an absence of proof of an unlawful agreement. Absent proof of the formation or existence of an unlawful agreement or conspiracy between appellants, the motions in arrest of judgment on the conspiracy to extort should have been granted.

On the charges against Kaleta and Yoho, with one exception, there is no evidence that either by color of their respective offices unlawfully took money from these contractors. The preponderance of the evidence clearly shows that the contributions were made by the contractors and received by Kaleta and Yoho as political contributions and not made to either of them for their personal use. It may well be that either Kaleta or Yoho or both pocketed some of the contributions and devoted them to their own personal use but the Commonwealth has not proven beyond a reason-

able doubt such to have been the case. The one exception arises in the testimony of Corbin that Yoho exacted from him a payment of two percent for his own purposes. Such testimony is sufficient to sustain the conviction of Yoho on the charge of extortion. However, prosecution of Yoho on the charge of extortion, unfortunately, has been barred by the two years statute of limitations in the Act of 1939 (Act of April 6, 1939, P. L. 17, §1, 19 PS §211) which provides: ". . . And provided also, That indictments for malfeasance, misfeasance, or nonfeasance in office, or for *extortion* or blackmail by color of office, or for embezzlement of public moneys or property or fraudulent conversion of public moneys or property, or for any misdemeanor in office, or for any *conspiracy to commit any of said offenses* heretofore or hereafter committed by any *officer or employe of this Commonwealth* or of any agency thereof, or of any city, county, borough, township, or school district or of any agency thereof, and their *accomplices* and *confederates,* may be brought or exhibited at any time within two years from the time when said public officer or said employe shall have ceased to occupy such office or such employment, but in no event more than six years from the commission of the offense." (Emphasis supplied). Yoho left office on March 29, 1957 and was not indicted until September 18, 1959, more than two years after he left office.

In regard to the Act of 1939, supra, we cannot agree with the construction and interpretation placed thereon by the majority of the Superior Court who completely disregard the two year period of limitations as leading to absurdity. While the Act contains two distinct periods of limitations—a two year and a six year period—the applicability of each or either is dependent upon the facts and circumstances of each case. However, the Act is not faulty, but, in fact, is supported by reason and logic. In this regard and to this

18

extent, we agree with the rationale set forth by Judge MONTGOMERY in his concurring and dissenting opinion wherein he stated: "The Act of 1939, April 6, P. L. 17, §1, 19 P.S. §211, is the applicable statute. It provides generally for a two-year limitation on the time for bringing prosecutions in such cases as we are considering (extortion and conspiracy to extort). However, it does contain certain provisions relating to (a) absentees, (b) officers of banks and other corporations, and (c) public officers, employes and their accomplices and confederates, in which cases the running of the general provisions of the statute is postponed or the time of the limitation period is extended. In the case of absentees, its running is postponed until the offenders return; in the case of bank and corporation officers, it is extended to six years; but in the case of public officers and employes, it is postponed with a limitation on the period of postponement. The majority in its opinion ignores the postponement provision because it believes that its application creates an absurd situation in the light of the limitation and considers this provision as a general extension as in the second provision. I find no absurdity in the application of both provisions but, on the contrary, see a reasonable result. The obvious intention of the legislature was to deny to offenders in government service the benefits of the statute until they had been out of service two years, during which period their affairs while in office could more readily be explored than when they were still present in office. However, the legislature apparently did not wish to extend this privilege to enforcement agencies beyond the six years provided as the period of limitation for bank and other corporate officers (as extended by proviso (b)). Under the Statutory Construction Act of 1937, May 28, P. L. 1019, article IV, §52, 46 P.S. §552, we are obligated to give meaning, if possible, to all parts of legislative enactments, and I think both provisions should be applied in this case.

"The application of both provisions may, of course, give some offenders an advantage over others, and it will make it possible for an unfaithful governmental officer or employe to conceal his crime and secure the benefit of the statute of limitations by preserving his status as an officer or employe beyond the six-year period. However, this is no different from the situation with reference to a bank or corporate officer. The legislature distinguished them in this fashion and it is not for this Court to remove that distinction."

We have carefully scrutinized this entire record, bearing in mind that "To prove a criminal conspiracy the evidence must rise above mere suspicion or possibility of guilty collusion": *Commonwealth v. Burdell,* 380 Pa. 43, 49, 110 A. 2d 193. Over 100 years ago this Court, speaking through Justice STRONG, in *Benford v. Sanner,* 40 Pa. 9, 17, said: "The humane presumption of the law is against guilt, and though a conspiracy must ordinarily be proved by circumstantial evidence, yet it is not to be forgotten that the charge of conspiracy is easily made, . . . Mere suspicion, possibility of guilty connection, is not to be received as proof in such a case, and especially in such a case, because, when the connection is proved, the acts and declarations of others become evidence against the party accused." Evidence to sustain a charge of conspiracy must be "such as reasonably and naturally justifies an inference of guilt of the accused and is of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. [Citing cases] A conviction will not be allowed to stand if it is based solely upon suspicions and conjectures. Com. v. Clinton, supra, 391 Pa. 212, 218, 137 A. 2d 463." *Commonwealth v. Evans,* supra, 190 Pa. Superior Ct. 179, 201, 202, 154 A. 2d 57.

Both quantitatively and qualitatively the evidence is insufficient to prove the existence of an unlawful

agreement or confederation between these four appellants to extort money from these contractors. While there is proof that each of appellants took part in securing from the equipment contractors certain contributions and to that extent did participate in the object of the alleged conspiracy, yet proof of any unlawful agreement rests simply on suspicion and surmise and does not satisfy the burden of the Commonwealth to prove the existence of the unlawful agreement or conspiracy beyond a reasonable doubt. Under the circumstances, the convictions of all four appellants on the charge of conspiracy to extort and of Yoho and Kaleta on the charge of extortion must be reversed.

Judgments reversed.