Commonwealth *v.* Nevitt, Appellant.

Argued April 13, 1970. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Thomas A. Livingston,* for appellant.

*Michael Fisher,* Assistant District Attorney, with him *Carol Mary Los,* Assistant District Attorney, and *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

Opinion by Hoffman, J., June 12, 1970:

Appellant was convicted of blackmail and conspiracy to commit blackmail. In his appeal from judgment of sentence, he alleges that the evidence was insufficient to support the guilty verdict.

Reviewing the evidence most favorably to the Commonwealth, *Commonwealth v. Tabb*, 417 Pa. 13, 207 A. 2d 884 (1965), we find the following:

Wayne McCue was driving with a number of companions from Ford City to White Oak, when Officer Piekielek attempted to stop McCue's car. McCue, however, would not stop and attempted to escape the pursuing officer. Finally, in McKeesport, a roadblock prevented the car from going further. Officer Piekielek arrested McCue. Another officer, Officer Zebrak, was also at the roadblock, but it was never established that he saw McCue driving the car. Piekielek and Zebrak took McCue to Mayor Alberts' office in White Oak, where they both signed an information, charging McCue with drunken driving. They also charged McCue with running a stop light.

McCue was told that he would be required to post a bond for his hearing on the drunken driving charge. The ensuing incidents served as the basis for the instant prosecution. McCue testified as to these incidents at appellant's trial as follows: "A. . . . Mayor Alberts called a bondsman [appellant] and he came and asked me, the bondsman asked me my name and age, where I lived and I didn't even know what he was doing, I thought maybe he was another police officer or something, so I asked him why he wanted this and he told me he was going to put up my bond for me. Q. What was said next between you and [the bondsman]? A. He told me that it would cost $65.00 for a Thousand Dollar bond. Mayor Alberts said that I had to have a Thousand Dollar bond. Q. What occurred next? A.

Then [appellant] asked me to go in the back room with him and he talked to me about making sure that I'd come to the hearing the next evening. Q. Can you recall the entire conversation? A. He said that he thought he could get it fixed for me. Q. Were those his exact words? A. Yes. Q. What else did he say? A. But it would cost me approximately $300.00. Q. What else was said? A. He told me not to tell anyone about this or he wouldn't be able to fix it for me. Q. Was that the entire conversation? A. Yes, sir. Q. What was your response? A. I told him it sounded good to me, that I would go along with it."

McCue then paid his fine for running the stop light and paid appellant for posting the bond. "Q. Now, after you had paid the fine and the money for the bond, what did you do next? A. We were all leaving and [appellant] told me that he'd take me down to my car and he said that he'd be right out and everyone else went out except [appellant], Police Officer Zebrak and Mayor Alberts. Q. Where were you at this time? A. I was outside at [appellant's] car and then [appellant] came out and he said that he talked it over with Mayor Alberts and the policemen and that they would go along with it."

Several days later, appellant picked McCue up to take him to Mayor Alberts' office for his hearing on the drunken driving charge. "A. [Appellant] got in my car and asked me if I had the money and I told him I did and he wanted the money then but I told him no, because there was no guarantee to me that Mayor Alberts and Policeman Zebrak even know anything about this but that I'd have to be free of my charges before I pay him the money. Q. What did he say to you? A. He said that would be okay. Q. What happened next or what did you do next? A. We got in his car then—we got out of mine, into his car, [appellant's] car, and went and picked up Police Officer Ze-

brak. Q. Where did you pick him up? A. At his home. Q. When Officer Zebrak got in the car, was there any conversation between you, Officer Zebrak and [appellant]? A. Officer Zebrak asked [appellant] if I gave him anything and [appellant] said that I wouldn't until after I seen the Mayor and the Policeman replied, 'That's okay.' Q. Was there any other conversation? A. No, that was all."

A hearing was held in Mayor Alberts' office. Officer Piekielek did not appear. Officer Zebrak testified that he could not identify McCue as the driver. The Mayor thereupon dismissed the charges. "A. Then I and [appellant] went into the back room in Mayor Alberts' home. Q. How did that happen, was something said to you? A. No, not actually, it was just more or less known what was going to happen next and we both just walked back. Q. Which room did you go into? A. The room right next to Mayor Alberts' Office, it's a back room. Q. What happened then there? A. I gave [appellant $265.00, which he gave me—all I had was twenties and I gave him $280.00 and he gave me $15.00 change and then he told me that Mayor Alberts might want something for his trouble. He then got up, walked to the door, opened the door and asked Mayor Alberts if he wanted anything for his troubles and Mayor Alberts answered 'No,' and the bondsman and I went back into the Office."

We reviewed the above testimony in *Commonwealth v. Zebrak*, 216 Pa. Superior Ct. 33, 260 A. 2d 480 (1969), in the case of Officer Zebrak. Officer Zebrak had been charged with conspiracy with appellant in this case. We concluded in *Zebrak* that with regard to Zebrak, his actions were "as consistent with innocence as with guilt." *Id.* at 35, 260 A. 2d at 481. Zebrak, as far as we can ascertain from the record, had not seen McCue driving. Accordingly, he testified truthfully at Mayor Alberts' hearing, when he said

that he could not identify McCue as having driven while drunk. Moreover, while Zebrak's two sentences of conversation with appellant could be viewed with suspicion, there were many reasonable explanations that wholely comported with innocence. We concluded, therefore, that Zebrak could not be found guilty beyond a reasonable doubt, when the evidence was viewed in the light most favorable to the Commonwealth. We relied upon *Commonwealth v. Neff,* 407 Pa. 1, 19, 179 A. 2d 630, 638 (1962), which in turn relied upon *Commonwealth v. Evans,* 190 Pa. Superior Ct. 179, 201-202, 154 A. 2d 57, 71 (1959), that "[e]vidence to sustain a charge of conspiracy must be such as reasonably and naturally justifies an inference of guilt of the accused and is of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. [Citations omitted.] A conviction will not be allowed to stand if it is based solely upon suspicions and conjectures."

The same decision is compelled with regard to appellant's conviction for conspiracy. Just as Zebrak's conspiracy with appellant was not proved beyond a reasonable doubt, so too, appellant's conspiracy with Zebrak, was not proved beyond a reasonable doubt. Similarly, the fact that Piekielek did not appear at the hearing raises no more than a suspicion of an agreement between the two. Also, the mayor's discharge of McCue of the drunken driving charge in short order only raises no more than a suspicion of criminal agreement. None of these acts is of a volume and quality sufficient to overcome appellant's presumption of innocence with regard to conspiracy.

The same, however, cannot be said with regard to his conviction for blackmail. Blackmail is a statutory offense which adopts the common-law definition of blackmail. "Whoever by means of . . . oral communications . . . levies blackmail . . . from any person . . .

is guilty of a misdemeanor [namely, blackmail] . . . ." The Penal Code, §801, Act of June 24, 1939, P. L. 872, 18 P.S. §4801. Blackmail has been defined* as follows: [To blackmail] is to wrest from, to exact, to take under a claim of protection, or the exercise of influence contrary to good morals and common honesty. Threats and violence may be used but are not necessarily involved in the offense described. The exercise of dishonest ingenuity in creating the impression of influence to protect from crime may amount to the exacting of money or other property . . . ." *Commonwealth v. Hoagland,* 93 Pa. Superior Ct. 274, 276 (1928). See also *Commonwealth v. Neubauer,* 142 Pa. Superior Ct. 528, 533, 16 A. 2d 450, 452 (1940). The evidence fully supports the jury's finding that appellant exacted money from McCue under a claim of influence to protect McCue from conviction.

Judgment of sentence with regard to count 3, namely blackmail, is affirmed. Judgment of sentence with regard to count 1, namely conspiracy, is reversed.

---

* The cited cases deal, in fact, with extortion. But extortion differs from blackmail only with respect to the person who commits the crime, not with respect to the manner of commission.