369 A.2d 488
COMMONWEALTH of Pennsylvania
v.
Ben SADUSKY, Appellant.

Superior Court of Pennsylvania.

Argued June 14, 1976.

Decided Nov. 22, 1976.

Wallace C. Worth, Jr., Allentown, for appellant.

Richard B. Russell, District Attorney, Tremont, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

In May, 1974, after a trial by a jury, appellant was found guilty of two counts of conspiracy, the first count, charging a conspiracy to violate the bidding requirements of the County Code; [1] the second count, charging a conspiracy to obtain money from Schuylkill County by fraudulent pretenses.[2] The jury acquitted appellant on the substantive charges of larceny and receiving stolen goods.[3] Appellant attacks his conviction on four grounds: first and second, that the verdict of guilty on both conspiracy counts was against the weight of the evidence; third, that the court erred in denying his motion for a mistrial when it learned that the daughter of one of the jurors worked in the District Attorney's office; the fourth, that the court erred when it allowed the prosecutor to show the jury the work product of one of the prosecution witnesses, which showed the excessive hours billed by appellant.

1. Act of August 9, 1955, P.L. 323, § 101 et seq.; 16 P.S. § 1802, as amended.

2. Act of June 24, 1939, 872, § 101 et seq.; 18 P.S. § 4302.

3. These charges arose out of allegations that employees of the Home were instructed to load boxes of food, allocated for kitchen use, into appellant's pick-up truck.

The factual history of the instant case, as evolved at trial, is tortuous. The appellant was the operator of a small contracting business in Schuylkill County. Appellant was indicted on July 10, 1972, the charges arising out of work performed by appellant on Rest Haven Home and Hospital, the County Home in Schuylkill County, from May, 1969, until October, 1971.

Prior to appellant's initial employment by the County, the Rest Haven Home had fallen into a state of disrepair. Wilson Lord, an assistant superintendent at the Home, testified that in 1969, the roof in the main building of the facility was in bad condition and that the Home had applied six months earlier to the Orwigsburg Roofing Company to do the repairs. He stated further that ". . . we had a very bad leak; it was coming in the downspouting. We were trying to get [another contractor] up, and he never came up. So then one day, Mr. Bambrick said that we got to get that roof. . . .

"Q. Identify Mr. Bambrick.

"A. He was the maintenance chief. He said that we got to get that roof fixed. . . . He said, I had a contractor at my house working now; and he said, he was talking to him about doing this roof work, and he does it. He said, if we could get a hold of him and get him down here, we could get this thing cleared up. I said, who is he. He said, Ben Sadusky [appellant]. So I called up Mr. Johnson.[4] I said, Elmer, we can get this roof fixed fast by a contractor; he said who is he. I told him. He said, do you know him? I said, no I don't know him. So he said, you get a hold of him and find out when he could start and do it."

---

4. Elmer Johnson was also indicted and pleaded guilty to charges arising out of the same conspiracy. Johnson was the Chairman of the Board of Commissioners.

After repairing the roof, appellant undertook additional work at the Home. It is uncontested that appellant performed emergency work on a number of occasions: [5]

"Q. [by the District Attorney] Then you weren't given [supervision of the work done] as one of your duties by the Commissioners?

"A. [by Clair Jones, administrator of the Home] [6] I was not given the duty to supervise any job that any person on the contracting end was concerned. Personally I had no knowledge of what was supposed to be done. I knew, for example, that there was some. . . . When we would have emergencies, we would call up Mr. Johnson, tell Mr. Johnson or one of the Commissioners who was there, and say that we have an emergency, and they'd say go ahead and get this done and we've had emergencies. Before we'd have people killed. . . . Why he knocked down some ceiling one day and near killed . . . . If they wouldn't have had a couple more beds away from where this thing was there. . . . Because it was right over here (indicating), and beds along here (indicating), and why when he hit that it came up to here (indicating). If Benny [appellant] wouldn't have had all those people pushed away, we'd have killed somebody. As I say we never knew exactly when an emergency like that would exist. When we'd call, we'd call and tell them that this was an emergency and we'd say we'd have to have it done; and that was the terms.

"Q. Well, now how many times is your best recollection would you say you had the so-called emergencies over this three-year period? Many times?

5. Whether the work was done pursuant to an emergency becomes important under the County Code, supra. The bidding requirements "need not be followed in cases of emergency, but in such cases the actual emergency shall be declared and stated by resolution of the commissioners." 16 P.S. § 1802(b).

6. Jones could not appear at trial due to illness. His deposition was read into the record by the attorneys and a third party who read the text of Jones's statements.

"A. Many, many times. Many, many times because I consider the job that he did on the roof where we had to have pots and pans under there catching the rain. The same way on the side where the bricks were loose that came in that we couldn't hold paint on the walls. . . ."

In addition, one of the county commissioners testified he sought the advice of the city solicitor. The solicitor advised the commissioners that they need not advertise work for under $1500 under the requirements of the Code.

At some point after appellant began working regularly at the Home, Mr. Krommes, County Controller, met appellant there and explained that appellant was required to itemize the bills which he had begun submitting to the Controller's office: ". . . we have made a policy as a result of efforts made at the Controller's convention, discussions that we had, that certainly where there is no contract the bills ought to be itemized; and, of course, we put a strict policy in the Controller's office; and that was on the advice of my former Solicitor who is now deceased. . . ."

It is clear that between 1969 and 1971, appellant submitted three hundred and ninety-nine bills for work performed. Except for a bill of $10,500.00, dated October 21, 1971, for work done pursuant to a contract for which bids were taken, none of the bills were based on a contract and none exceeded $1,500.00. The bills were for amounts as small as $68.10 and as large as $1,500.00; appellant often submitted several bills on the same day. The appellant billed the county for a total of $287,060.00 over the three year period. Krommes stated that he was responsible for checking submitted bills to determine whether the work was done pursuant to a contract. He noticed that appellant was submitting multiple bills, and

he brought that fact to Commissioner Johnson's attention:

"Q. [by the District Attorney] . . . did you take notice that shortly after [appellant] was employed in 1969 that multiple bills started to come from [appellant]?

"A. Yes, I did.

"Q. Did you do anything about this?

"A. I don't know at what stage I did, but I had been concerned. . . .

"Q. Multiple bills for one job or multiple bills for several jobs? Did you say multiple bills were coming through?

"A. The best I can describe it is that they would come up maybe 6, 7, 8, 9 bills at a time. I can't tell you at this stage just what they were for.

"Q. Did you do anything about that?

"A. I attempted to do something about it; I called the attention to the Commissioners, principally the Chairman of the Board.

"Q. Who is?

"A. Mr. Johnson. . . .

"Q. What did Mr. Johnson say?

"A. Several times I talked to him and he pointed out to me that they were occasionally emergencies and I remember, it is not really clear, but the fact that you couldn't write specifications for the types of jobs that were being done down there; the building was old; it was in bad shape."

The above evidence was intended to show that appellant failed to enter bids for work which he performed; that, although some of the work was done in response to an emergency, the bulk of the work was not; that by means of multiple billing, appellant circumvented the $1,500 limitation for bidding purposes; that the County had an elaborate procedure to assure that contractors

454

complied with the bidding requirement; and that such a procedure was circumvented in appellant's case. Further, the Commonwealth attempted to prove the conspiracy with Commissioner Johnson to violate the bidding requirement by showing that Johnson knew that appellant was circumventing the statute and that he allayed the fears of one of the county employees who raised questions about the propriety of multiple billings. The linchpin of the Commonwealth's conspiracy theory was that appellant's records showed that he had been employed by Johnson to do construction and repair work on two homes owned by Johnson and that bills for $1,500 and $4,100, dating back to 1969, had not been paid prior to the grand jury investigation. His records showed that bills for $1050 and $590 had been paid.

The gravamen of the charge of obtaining money by fraudulent pretenses [7] was that appellant had overbilled the County for work performed. Pursuant to the controller's instructions, appellant itemized his bills for labor and material. As summarized by the Commonwealth, "[t]he appellant charged the County with 15,012 hours of labor at $4.00 and $5.00 an hour, developing a payment to himself of $70,240.00 . . . for the period from July 10, 1970, to the end of 1971; [8] which is far in excess of the hours of labor and salaries earned by his employees as disclosed in the reports filed by the appellant with the Department of Labor and Industry of Pennsylvania for that period, and as corroborated by the testimony of appellant's employees at the trial. A copy of appellant's report, which was admitted into evidence

7. The Commonwealth attempted to prove the second conspiracy, to obtain money by fraudulent pretenses, by use of the same evidence as it relied on to prove the conspiracy to violate the County Code.

8. The Commonwealth calculated the overbilling from July 10, 1970, to the time appellant ceased work for the county because the two year statute of limitations prevented reliance on evidence of earlier transactions. Act of March 31, 1860, P.L. 427, § 77; 1939, April 6, P.L. 17, § 1; 19 P.S. § 211.

. . . discloses payment of salaries to employees for said period of $15,322.40 which compares to the $70,240.-00 charged the County."

It is a blackletter principle that a criminal conviction must be based on more than mere suspicion or conjecture. *Commonwealth v. Roscioli*, 454 Pa. 59, 309 A.2d 396 (1973). Further, ". . . evidence to sustain a charge of conspiracy must be 'such as reasonably and naturally justifies an inference of guilt of the accused and is of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. . . .' " *Commonwealth v. Yobbagy*, 410 Pa. 172, 176–77, 188 A. 2d 750, 752 (1963). See also, *Commonwealth v. Santana*, 216 Pa.Super. 183, 264 A.2d 724 (1970). Of course, it is true that "a conspiracy may be inferentially established by showing the relation, conduct or circumstances of the parties . . .." *Commonwealth v. Rosen*, 141 Pa.Super. 272, 276, 14 A.2d 833, 834 (1940). To meet its burden, the Commonwealth must prove with credible evidence that two or more persons have formed an agreement to perform an illegal act,[9] or, under the Penal Code [10] and the common law, to do a lawful act in an illegal manner. *Commonwealth v. Yobbagy*, supra; *Commonwealth v. Neff*, 407 Pa. 1, 179 A.2d 630 (1962). The Commonwealth must prove the existence of an agreement, not merely an association between or among the co-conspirators. *Commonwealth v. Minor*, 227 Pa. Super. 343, 322 A.2d 717 (1974).

We must be mindful of the potential overbreadth of criminal conspiracy statutes and that, therefore, we must require strict adherence to the standards articulated above: "As a practical matter, the accused is often confronted with a hodgepodge of acts and statements by oth-

9. See The Crimes Code, Act of December 6, 1972, P.L. 1482, No. 334, § 1; 18 Pa.C.S. § 903.

10. Act of June 24, 1939, P.L. 872, § 302; former 18 P.S. § 4302.

ers which he may never have authorized or intended or even known about, but which help to persuade the jury of the existence of the conspiracy itself." *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L. Ed. 790 (1948) (concurring opinion, Jackson, J.). As noted by one commentator, "[l]ittle wonder that modern-day conspiracy has been called 'the darling of the modern prosecutor's nursery' and a 'drag-net device capable of perversion into an instrument of injustice.'" Comment, Criminal Law: Criminal Conspiracy Under the New Pennsylvania Crimes Code, 78 Dick.L.Rev. 159, 163 (1973), citing *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925); *Dennis v. United States*, 341 U.S. 494, 572, 71 S.Ct. 857, 95 L.Ed. 1137 (1950) (concurring opinion, Jackson, J.).

Initially, the Commonwealth failed to prove by direct evidence the existence of a conspiracy between appellant and Johnson. The Commonwealth's evidence showed that the Home was in a state of disrepair, and that appellant's work was often necessary to protect the lives of the residents of the Home. Again, several of the Commonwealth's witnesses testified that much of the work performed was emergency in nature. In fact, two commissioners, the controller, and the superintendent of the Home all testified for the Commonwealth; each stated that many of the jobs performed by appellant were emergencies. The evidence also showed that although some of the repairs were not technically emergencies, they were done ancillary to emergency repair work. (e. g., painting a wall after the wall had been reinforced).

The Commonwealth argues that, to avoid the bidding requirement of § 1802, an emergency must have been declared by a resolution of the board of commissioners. See The County Code, supra; 16 P.S. § 1802(b). At the same time, the Commonwealth's evidence showed that, while no emergency was declared, several of the Commonwealth's witnesses believed that an emergency situa-

tion existed for purposes of hiring a contractor and that the Solicitor had given them an opinion that, under the circumstances, no bid was required. Thus, a review of the Commonwealth's evidence indicates that the commissioners made a good faith effort to have the dilapidated home repaired, that appellant was willing to do work immediately that another contractor had not bothered to perform for over six months, and that all the work that was completed by appellant was done in a workmanlike fashion. Although we view the evidence in a light most favorable to the Commonwealth, the Commonwealth's evidence is inconsistent with its own theory of the case. We find that the weight of the evidence was too insubstantial to support the verdict of guilt and, therefore, we remand for a new trial.

WATKINS, President Judge, did not participate in the consideration or decision of this case.

PRICE, J., was absent.

SPAETH, J., concurs in the result.