254

420 A.2d 1129

**COMMONWEALTH of Pennsylvania**

v.

**Donald MILLER, Appellant.**

Superior Court of Pennsylvania.

Argued March 18, 1980.

Filed June 27, 1980.

Reargument Denied Sept. 8, 1980.

Petition for Allowance of Appeal Denied Oct. 30, 1980.

Anita M. Cohen, Philadelphia, for appellant.

Kenneth S. Gallant, Assistant District Attorney, Erie, for Commonwealth, appellee.

Before HESTER, WICKERSHAM and LIPEZ, JJ.

WICKERSHAM, Judge:

The defendant has appealed to this court from his non-jury trial conviction and judgment of sentence on charges of burglary and criminal conspiracy.

"The facts surrounding the defendant's arrest and conviction are as follows. On December 15, 1977, the complainant, Lawrence Fanrak, left his home at about 10:00 a. m. to do some shopping. When he left no one else was at home and he locked the door behind him.[1] When he

---

1. Although Mr. Fanrak lived with his wife and mother, he was the last one to leave his house that morning (N.T. 12/15/78 21).

returned about an hour later, he saw two men at the front of his house. One of the men was on the top step "looking around" and the second man was going in the front door (N.T. 12/15/78 21). Since Mr. Fanrak knew neither person, he shouted at them, at which point both men ran away (N.T. 12/15/78 23). Mr. Fanrak attempted to pursue them in his car but he lost sight of them for about half an hour. Mr. Fanrak spotted the two again near a vacant lot a short way from his house and again he gave chase, this time on foot. He pursued only one of the men, later identified as the defendant. During the chase, the defendant lost his shoe but did not stop to retrieve it.

"A neighbor of Fanrak's, Maureen Jaroszewski, happened to be on her front porch when Mr. Fanrak was pursuing the defendant and she saw him lose his shoe and continue running (N.T. 12/15/78 49) Mrs. Jaroszewski, a police officer's wife, immediately learned that Fanrak had been chasing a man who had broken into his home and so when the defendant trotted by her home again about fifteen minutes later, she recognized him and noted that he still had on only one shoe (N.T. 12/15/78 57). In addition, Mrs. Jaroszewski watched the defendant get into a car with a "noisy muffler" (N.T. 12/15/78 56). At noon on the same day, Mrs. Jaroszewski was at her post as a crossing guard when she again noticed the defendant behind the wheel of the same car stopped at a red light. This time Mrs. Jaroszewski noted the first three digits on the license tag of the defendant's car (N.T. 12/15/78 58–59).

"Two days later, the defendant was driving his car when the noisy muffler caused Officer Dennis Veale of the Philadelphia Police to stop him (N.T. 12/1/78 120). With the defendant was a red–haired man by the name of John Green, subsequently identified as the second burglar. As Officer Veale was investigating the fact that neither driver nor passenger had license or registration, another police officer told Officer Veale about the Fanrak burglary and supplied him with a description which included the

color, make, and year of the car and the first three digits of the license plate (N.T. 12/1/78 123). In addition, the burglars were described as two white males, one of whom was a red–head. Officer Veale placed both the defendant and Green under arrest (N.T. 12/1/78 124).

"Later that day, when Mr. Fanrak was shown photographs of both the defendant and Green, he failed to identify the defendant and, therefore, the defendant was released (N.T. 11/29/78 65).

"On May 18, 1978, when Mrs. Jaroszewski was subpoenaed to court for Green's trial, the same group of photographs was shown to her. Present were an Assistant District Attorney, an Assistant Public Defender to represent Green and the same Detective who had shown the photographs to Fanrak. Mrs. Jaroszewski chose the defendant's photograph as the person she had seen Fanrak chasing on the day of the burglary. Pursuant to this identification, the detective obtained a warrant for the defendant's arrest and a complaint was filed on June 5, 1978.

"At trial, Mr. Fanrak stated that he was positive that the man who had entered his front door was the same man he chased and who lost his shoe during the pursuit (N.T. 12/15/78 46–47), although he could not make an in–court identification, Mrs. Jaroszewski was positive that the man whose picture she had chosen was the man she saw Fanrak chasing and the man she saw on two other occasions in his car that same day. In court she identified the defendant as that person (N.T. 12/15/78 62).[2]"

Defendant raises three questions for our consideration which we shall consider seriatim.[3]

**2.** Commonwealth brief, pages 1–3, which facts we find to be accurately stated from our independent review of the record.

**3.** 1. Was the evidence sufficient to sustain the verdict of guilty of burglary and criminal conspiracy?

2. Did the lower court err in denying the Motion to Suppress identification?

3. Did the lower court err in denying the Petition to Dismiss pursuant to Pa.R.Cr.Pr. 1100?

1. Was the evidence sufficient to sustain the verdict of guilty of burglary and criminal conspiracy?

First, defendant contends that the evidence was insufficient to prove an entry. There is no merit to this suggestion. The victim had left his private home an hour before the incident. When he returned he saw "two people going in my front door." One was in the vestibule, having gone beyond the door leading to the vestibule from the outside. The victim had closed that door when he left the home earlier. After the two persons fled, the victim inspected his property and observed a broken doorknob on the outer door, which had been in good condition when he left an hour earlier.

Burglary is defined as:

**(a) Offense defined.**–A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter.

**(b) Defense.**–It is a defense to prosecution for burglary that the building or structure was abandoned.

**(c) Grading.**–Burglary is a felony of the first degree.

**(d) Multiple convictions.**–A person may not be convicted both for burglary and for the offense which it was his intent to commit after the burglarious entry or for an attempt to commit that offense, unless the additional offense constitutes a felony of the first or second degree.

1972, Dec. 6, P.L. 1482, No. 334, § 1, eff. June 6, 1973, 18 Pa.C.S.A. § 3502.

As we said in *Commonwealth v. Carter*, 236 Pa.Super. 376, at 378, 344 A.2d 899 at 900 (1975), reversed on other grounds, 482 Pa. 274, 393 A.2d 660 (1978):

The language of the "Crimes Code" regarding burglary comes from the "Model Penal Code", section 221.1. The fundamentals of the crime, entering a building with criminal intent, are similar to burglary under our former "Pe-

nal Code".[3] We turn to the case law under our former statute to determine the elements of the crime. "The elements of burglary are the intent to commit a felony and the successful and effective overt act directed toward the commission of the felony by the wilful and malicious entry into a building. *Commonwealth v. Procopio*, 200 Pa.Super. 226, 188 A.2d 773 (1963) . . . ." *Commonwealth v. DelMarmol*, 206 Pa.Super. 512, 516, 214 A.2d 264, 266 (1965). Constructive, although incomplete, entry, as by a portion of the body only, satisfies the entry requirement of the crime. *Commonwealth v. Myers*, 223 Pa.Super. 75, 297 A.2d 151 (1972). *Commonwealth v. Garrett*, 423 Pa. 8, 222 A.2d 902 (1966), notes that the common law crime of burglary has been expanded in its concept, but that wilful and malicious entry are still needed. For present purposes, we note that under the current statute, which is bolstered by case law under the former statute, the operative concepts for the crime of burglary are entry, intent to commit a crime within the building entered, and lack of a license or privilege to enter. (Footnote Omitted)

We have concluded that the evidence was sufficient to support a reasonable inference by the fact finder that appellant entered the victim's house with the intent to commit theft after entry. See *Commonwealth v. Morgan*, 265 Pa. Super. 225, at 236, 401 A.2d 1182 at 1187 (1979):

We have concluded that the evidence was sufficient to support a reasonable inference by the jury that appellant intended to commit theft. The incident involved a residence, which one ordinarily expects to contain items of value that can be removed by a single individual without the use of special tools.

■ Conspiracy is defined as:

(a) **Definition of conspiracy.**–A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime;  or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime, 18 Pa.C.S.A. § 903.

The proper test was enunciated in *Commonwealth v. Roux*, 465 Pa. 482 at 487, 350 A.2d 867 (1976):

However, the Commonwealth is not required to establish the existence of a conspiracy by direct proof of an explicit or formal agreement.  *Commonwealth v. Waters, supra; Commonwealth v. Dickerson*, 406 Pa. 102, 106, 176 A.2d 421 (1962).  Indeed, direct proof of an explicit or formal agreement to commit a crime can seldom, if ever, be supplied and it need not be for "it is established law in this Commonwealth that a conspiracy may be proved by circumstantial evidence as well as by direct evidence." *Commonwealth v. Eiland*, 450 Pa. 566, 570, 301 A.2d 651, 652 (1973).  See also *Commonwealth v. Yobbagy*, 410 Pa. 172, 177, 188 A.2d 750 (1963).  Thus, while more than mere association must be shown, "[a] conspiracy may be inferentially established by showing the relation, conduct or circumstances of the parties, and the overt acts on the part of co–conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed: [cite omitted]." *Commonwealth v. Horvath*, 187 Pa.Super. 206, 211, 144 A.2d 489, 492 (1958).  See also *Commonwealth v. Eiland, supra; Commonwealth v. Neff*, 407 Pa. 1, 6, 179 A.2d 630 (1962).

Herein, there was sufficient evidence presented of shared criminal intent and activity to justify the trial court's finding that defendant was part of a conspiracy to burglarize the home of Lawrence Fanrak.

2.  Did the lower court err in denying the Motion to Suppress identification?

At trial Mrs. Maureen Jaroszewski identified the defendant:

Maureen Jaroszewski–Direct

Q  Now, the only other question I have of you is do you see the man in court today who you saw back on December 15th run past your house and lose his shoe?

A  Yes, I do.

Q  Would you point him out, please?

A  He is over there (indicates).

MR. HAINES:  Indicating the Defendant, Donald Miller.

BY MR. HAINES:

Q  Is his appearance today the same or different than it was on December 15th, as you recall?

A  His hair is a little shorter that is about all.

Q  That is about all?

A  Yes.

(N.T. 25)

Thus, there would seem to be no viable identification issue but the defendant argues that his arrest on December 17, 1977, was unlawful as being without probable cause.  Photographs taken of the defendant that day were subsequently identified by Mrs. Jaroszewski during the trial of John Green on May 18, 1978, leading to defendant's re–arrest on July 28, 1978.  Defendant argues therefore that the whole identification process was tainted.

In *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), the United States Supreme Court was called upon to decide whether an in–court identification of the accused by the victim of a crime should be suppressed as the fruit of the defendant's unlawful arrest:

### A

In this case, the robbery victim's presence in the courtroom at respondent's trial was surely not the product of any police misconduct.  She had notified the authorities immediately after the attack and had given them a full description of her assailant.  The very next day, she went to the police station to view photographs of possible

suspects, and she voluntarily assisted the police in their investigation at all times. Thus this is not a case in which the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused.[15] Here the victim's identity was known long before there was any official misconduct, and her presence in court is thus not traceable to any Fourth Amendment violation.

## B

Nor did the illegal arrest infect the victim's ability to give accurate identification testimony. Based upon her observations at the time of the robbery, the victim constructed a mental image of her assailant. At trial, she retrieved this mnemonic representation, compared it to the figure of the defendant, and positively identified him as the robber.[16] No part of this process was affected by respondent's illegal arrest. In the language of the "time–worn metaphor" of the poisonous tree, *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), the toxin in this case was injected only after the evidentiary bud had blossomed; the fruit served at trial was not poisoned.

This is not to say that the intervening photographic and lineup identifications–both of which are conceded to be suppressible fruits of the Fourth Amendment violation– could not under some circumstances affect the reliability of the in–court identification and render it inadmissible as well. Indeed, given the vagaries of human memory and the inherent suggestibility of many identification procedures,[17] just the opposite may be true. But in the present case the trial court expressly found that the witness' courtroom identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record.[18] In short, the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful police

conduct committed long after she had developed that capacity.[19]

## C

Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865–866, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).[20] The exclusionary principle of *Wong Sun* and *Silverthorne Lumber Co.* delimits what proof the Government may offer against the accused at trial, closing the courtroom door to evidence secured by official lawlessness. Respondent is not himself a suppressible "fruit," and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of evidence wholly untainted by the police misconduct. (Footnotes Omitted)

We conclude that the police had probable cause to arrest the defendant on December 17 and that, therefore, the photograph taken on that date was not the fruit of an illegal arrest. Even if unlawful, the in–court identification of the accused was proper under all the circumstances.

3. Did the lower court err in denying the Petition to Dismiss pursuant to Pa.R.Crim.P 1100?

■ There is simply no merit to this contention. In the instant case the defendant, although arrested on December 17, 1977, was released the same day since the victim, Lawrence Fanrak, was unable to identify defendant's photograph. No criminal complaint was filed against the defendant. Clearly the 180 day period pursuant to Rule 1100 Pa.R.Crim.P., could not have and did not commence. The rule governs a court case in which a "written complaint is

filed against the defendant." It was only after Mrs. Jaroszewski, on May 18, 1978, saw and identified defendant's photograph that the instant prosecution began. *Commonwealth v. Mitchell*, 472 Pa. 553, 372 A.2d 826 (1977).

Judgment of sentence is affirmed.[4]

---

4. Defendant received concurrent sentences of from two to ten years in prison.